Booth:, Judge,
delivered the opinion of the court.
The Congress sent this case to the court by granting jurisdiction to hear and determine it in accord with the following special act:
“ That all claims of whatsoever nature which the Sisseton and Wahpeton Bands of Sioux Indians may have or claim to have against the United States shall be submitted to the Court of Claims, with the right to appeal to the Supreme Court of the United States by either party, for the amount due or claimed to be due said bands from the United States under any treaties or laws of Congress; and jurisdiction is hereby conferred upon the Court of Claims to hear and determine all claims of said bands against the United States and also any legal or equitable defense, set-off, or counterclaim which the United States may have against said Sisseton and Wahpeton Bands of Sioux Indians, to enter judgment, and in determining the amount to be entered herein the court shall deduct from any sums found due said Sisseton and Wahpeton Bands of Sioux Indians any and all gratuities paid said bands or individual members thereof subsequent to March third, eighteen hundred and sixty-three: Provided, That in determining the amount to be entered herein, the value of the land involved shall not exceed the value of such land on March third, eighteen hundred and sixty-three. If any such question is submitted to said c,ourt it shall settle the-rights, both legal and equitable, of said bands of Indians, and the United States, notwithstanding lapse of time or stat *323 ute of limitations. Such, action in the Court of Claims shall be presented by a single petition, to be filed within one year after the passage of this act, making the United States a party defendant which shall set forth all the facts on which the said bands of Indians base their claims for recovery; and the said petition may be verified by the agent or authorized attorney or attorneys of said bands, to be selected by said bands and employed under contract approved by the Commissioner of Indian Affairs and the Secretary of the Interior, in accordance with the provisions of existing law, upon information or belief as to the existence of such facts, and no other statements or verifications shall be necessary. Official letters, papers, reports, and public records, or certified copies thereof, may be used as evidence.” (Act of April 11, 1916, 39 Stat. 47.)
The Sisseton and Wahpeton Indians are Sioux, bands of the original tribe of Sioux Indians. They, in company with the Medawakanton and Wahpakoota Bands of the Sioux Tribe, found some time prior to July 23,1851, in the present State of Minnesota, a habitat along the upper Mississippi River, most of them on the west side of the stream, some few of the latter bands on the east. They were known and spoken of as the eastern, or Minnesota, Sioux, the Government designating them as Sioux of the Mississippi, to distinguish them from the other bands of the same tribe. The four bands ranged over a vast extent of territory and claimed ownership of a vast acreage by reason of that fact. As early as 1851 the Government attempted to reduce the claimed acreage to a reservation basis, and did, on July 23, 1851, 10 Stat. 949, negotiate a treaty with the Sisseton and Wahpe-tons, by the terms of which certain concessions were made to the Government, and on August 5,1851,10 Stat. 954, a treaty was negotiated with the Medawakanton and Wahpekootas, which, in conjunction with the treaty of July 23, 1851, provided for the four bands two reservations along the Minnesota River. The Indians were removed to the reservations, each band being assigned the lands granted by the treaty, after which the Sisseton and Wahpetons were known as the upper bands, and the Medawakanton and Wahpakootas as the lower bands, the Government treating and dealing with them under the general appelation of annuity Sioux.
*324 Afterwards, when both of said treaties came before the Senate for ratification, the Senate instead of ratifying them as negotiated, substituted a provision for the purchase of all of said reservations from the four bands for 10 cents an acre, adding this amount to their trust funds, and authorizing the President, with the assent of the Indians, to set apart another reservation outside the limits of the territory ceded to the Government by the treaties for their future home and occupancy. The President was vested with the additional authority to vary the conditions with the consent of the Indians if deemed expedient. The Indians accepted the amendment, and the treaties, as amended, were ratified by them September 4 and 8, 1852, 10 Stat. 952-958. The 10 cents per acre was paid by the Government and the money was duly credited to the trust funds of the bands, but the reservation provided for was never set apart. The Indians, therefore, continued to reside on the said reservations on the Minnesota Eiver. They were not disturbed and made valuable improvements on these reservations. On July 31,1854, Congress enacted a law authorizing the President to confirm said reservations to said bands. There is no record of any official action by the President, but the Indians were in peaceable possession and, as before observed, they were not in any way disturbed.
On June 19, 1858, 12 Stat. 1031-1037, treaties were concluded with the four bands occupying the foregoing reservations, by the terms of which the Indians ceded to the Government the portions of the reservations lying on the north side of the Minnesota River, and there were confirmed to them the lands on the south side, which were to be allotted to the Indians in severalty, the surplus after allotments to be held as other Indian lands. The question of title and the price to be paid for the lands on the north side were left to the United States Senate for decision. The Senate, on June 27, 1860, by resolution, confirmed the Indians’ title to the whole of the reservations, and fixed 30 cents per acre as the sum to be paid for the lands ceded to the Government.
The Sissetons and Wahpetons received under this treaty $170,880 for 569,600 acres, the same being paid in accord with the act of March 2,1861,12 Stat. 237. The allotments, *325 however, were never made, because in August, 1862, the Indian beneficiaries under the treaties joined in an intense, prolonged, and exceedingly savage warfare against the Government, a hostility which required a considerable portion of the Army to finally subdue. A large number of whites— men, women, and children — were cruelly murdered and a great amount of property burned and destroyed. At the time of the outbreak the total population of the Sisseton and Wahpeton Bands, including men, women, and children, was 4,026, and the Medawakanton and Wahpakoota Bands comprised 2,225. By the spring of 1863 the military authorities had succeeded, either by capture of surrender, in taking into custody the greater portion of the Medawakanton and Wahpakootas and a few of the Sisseton and Wahpetons, and confined them all as prisoners of war at Fort Snelling. On February 16,1863, 12 Stat. 652, as a further infliction of punishment, by legislation of that date, Congress abrogated and annulled all existing treaties with the Indians and forfeited to the Government all their annuities, charging the same with the payment of all damages occasioned by the outbreak.
On March 3, 1863, 12 Stat. 819, Congress passed an act providing for the creation of a reservation outside the limits of any State, of sufficient proportions to allot to each member of the four bands 80 acres, provided they were willing to adopt the pursuit of agriculture. The act contained a further provision for the sale of the former reservations on the Minnesota Biver and the investment of the money by the Secretary of the Interior for the benefit of the Indians who actually located on the lands of the new reservation. The President, in pursuance of the foregoing enactment, set apart certain lands at Crow Creek on the Missouri Biver in Dakota Territory, and in May following removed thereto all the prisoners of war except half-breeds and scouts confined at Fort Snelling, 1,306 in number. There were at least 295 Sisseton and Wahpetons included in this number, and at least 4 of their chiefs and several headmen and influential soldiers. On July 1, 1863, a formal Executive order was issued, setting apart said lands as a reservation for the “ Sioux of the Mississippi.”
*326 The plaintiff Indians on the facts above epitomized assert a demand for damages rested upon the contention that the President of the United States did not under the act of March 3,1863, comply with its terms and set apart a reservation for the Sisseton and Wahpeton Indians; that they were not included in the Crow Creek Eeservation set apart July 1,1863; that on July 1,1863, there were 4,524 of said Indians lawfully entitled to 80 acres each, or 361,920 acres, of land, worth $1.25 per acre. In the face of the record it is difficult to comprehend an insistence that the President was remiss in not setting apart 361,920 acres of land in 1863 for the Sisseton and Wahpetons, when these Indians at the time were fleeing from capture, openly hostile to the Government, and being closely and continuously pursued by the Army of the United States. If the Government was put under the unique obligation by the terms of the act of March 3, 1863, of providing a permanent home for individual Indians fleeing from justice to all points in the West and in Canada, then some measure of weight might be ascribed to the contention. The act of March 3, 1863, was obviously intended to remove from Minnesota these bands of undesirable Indians, and it in express terms allotted to only those individual Indians willing to adopt the pursuit of agriculture, hoping thereby to civilize them. It is inconceivable that Congress intended to do more than provide for Indians in amity with the Government and willing to observe the laws. The major portion of the Sisseton and Wahpeton Bands were scattered, some in Canada, many in the far West, and all removing themselves as far and as rapidly as possible from the range of military activities.
Accentuating this position is the further important circumstance that of the hostile Sisseton and Wahpetons, for whom such a large claim is made, none appear ever to have applied for enrollment or allotment at the Crow Creek Ee-servation, and those in amity who did were cared for. Even the small number of peaceable ones removed were loath to and did not long remain there after the subsequent return of the fugitives. The activities of the Army did not cease until late in 1864, and by this time there were few, if any, Sisseton and Wahpeton Indians in Minnesota, and no such *327 number as now claimed for ever did return. Along about tlie year 1866 tbey came drifting back. The Army had been withdrawn from the field and some six or eight hundred were in the vicinity of Fort Wadsworth, in eastern Dakota. The Government attempted on two occasions to treat with them at this place, but was unsuccessful until 1867. In February of that year a treaty was made and two reservations set apart for the members of the plaintiff bands who had not been sent to the Crow Creek Reservation. Finding X details the facts and discloses a final recognition of the Indians’ claimed rights more magnanimous in terms than the act of 1863.
The President under the act of 1863 could not accomplish the impossible, and Congress, by subsequent legislation, did even more as a substitute than was imposed upon him by the prior statute. The President was by law charged with providing for an existing and contemporaneous condition of affairs. How manifestly absurd it would have been for him to set aside this vast and extensive acreage for a band of hostile Indians, when by no possible process of reasoning could he apprehend to what extent it would be taken up by the Indians who had, at least for the time, expatriated themselves. The act of 1863 was no more than a conditional grant, and even if it were otherwise the control and management of Indian tribal lands is exclusively a matter within the jurisdiction of Congress, free from the supervision of the courts. Cherokee Nation v. Hitchcock, 187 U. S. 294; Lone Wolf v. Hitchcock, 187 U. S. 553.
The next item for which claim is made is rested more upon a supposed moral than a legal obligation. Mutual mistake of fact is assigned as of sufficient force and clearness to warrant the court in revising and substantially reasserting the terms of a treaty and an act of Congress, the whole tone of the contention being more in effect a supplication than an assertion. On June 7, 1872,17 Stat. 281, Congress passed an act directing the Secretary of the Interior to investigate and report what title and interest the plaintiff Indians had in a large and extensive area of lands, outside their reservations at Lake Traverse and Devils Lake, and whether any compensation ought in equity and good conscience to be paid the *328 Indians for whatever title they might have. Under the authority of the act the Secretary appointed a commission, which finally reported that in its judgment the treaty of February 18,1867, between the Government and the Indians, recognized the title of the Indians thereto, and that the Government under the facts was estopped to deny it, a very doubtful conclusion in view of the situation at the time, for the title asserted by the plaintiff Indians was sedulously disputed by the Missouri Sioux; and the Government, by the treaty of 1867, confirmed to the plaintiff Indians only so much of the lands as were embraced within the two reservations set apart for them. It is true the Government did acquire rights of way for telegraph lines and public roads, and in this respect did recognize some proprietary interests in the lands, but it may well be that the motive which prompted such generous conduct was more in the interest of composing hostility to be feared from the Indians without so acting.
In any event, the issue is not of great importance, for negotiations progressed to the point of bargain and sale and finally on May 2, 1873, a treaty was fully ratified and confirmed, with the positive assent of the Indians, by the terms of which these lands outside of said reservations, specifically described by metes and bounds, were ceded to the United States for $800,000, and the money subsequently paid as per the terms of the same. Now, more than a half century after the event, a claim is set up that the treaty was procured by misrepresentation and both parties were in error as to the acreage of the cession, the Indians believing they were parting with 8,000,000 acres at 10 cents an acre and the United States believing that to be the extent of the lands. The facts negative the claim, notwithstanding the cession was of 11,000,000 acres, and we may not under the law receive parol testimony to nullify the terms of a treaty, negotiated and ratified in conformity with law. As was said in the case of United States v. Old Settlers, 148 U. S. 427, 468:
“ There is nothing in the jurisdictional act of February 25, 1889, inconsistent with the treaty of 1846 (or any other), and nothing to indicate that Congress attempted by that act to authorize the court to proceed in disregard thereof. Unquestionably a treaty may be modified or abrogated by *329 an act of Congress, but the power to make and unmake is essentially political and not judicial, and the presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its action or the action of the Government to judicial decisions, by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act, does not in the least degree justify any such inference.”
In 1917 we had before us a contention similar to the one advanced in this case, and the court in disposing of it (Otoe & Missouria Indians v. United States, 52 C. Cls. 424, 429) used this language: “ That this [act] does not give this court jurisdiction to inquire into the inequity or impropriety of any of these treaties between these Indians and the United States is so obvious as to hardly need citation of authorities.”
The jurisdictional act here involved is not different in any essential from those construed in the citations mentioned and is not so worded as to make it an exception to the well established rule. The item is not allowed.
The plaintiff Indians manifestly misapprehended the scope and character of the jurisdictional act and the limitations of the court thereunder. There is nothing in the act which authorizes us to go into a minute investigation of the Indians’ tribal relations to the Government and delve into the endless negotiations leading up to the consummation of treaties. We can not ascribe fraud and misrepresentation as the motive for legislation or treaties. Our jurisdiction is limited to rights which may or may not accrue under treaties and acts of Congress. When Indian rights of property are fixed by the terms of treaties and statutes we are bound to accept them as so fixed. The Supreme Court has so held innumerable times, the citations appearing in 52 C. Cls. 429.
In view of the foregoing statement there is no necessity for any prolonged discussion of the claims made under items 8 and 4 of the petition.
The Government under the various treaties mentioned purchased the lands described. In 1852 the Indians assented to the arrangement, accepted the benefits stipulated, and have recently recovered in this court the balance of their restored annuities. The development of the situation finally *330 culminating in the establishment and sale of the reservation set apart on the north and south sides of the Minnesota River in 1851-1852 has been f ully adverted to. The Indians concede that in so far as the express terms of the treaties are concerned, they were fully complied with, and assuredly we may not go back to contemporaneous times on the faith and credit of parol testimony given at this late date to challenge the Indian signatures appearing on the treaties, and ascribe a wholesale overreaching of the Indians by the Government’s representatives, including the Senate of the United States.
In the case of Delaware Indians v. Cherokee Nation, 193 U. S. 127, 141, the court said: “ We can perceive no room in this case for a departure from the familiar rules of the law protecting written agreements from the uncertainties of parol testimony. The testimony offered was in the main that of interested persons nearly thirty years after the agreement had been reduced to writing and signed by the parties thereto.”
Judgment for $15,443.95 is asked in item 5 on the theory of an overpayment to the Medawakanton and Wahpakoota Bands out of the funds realized from a sale of the reservations of the four bands originally set apart alongside the Minnesota River by the early treaties mentioned in Finding IX.
It is to be recalled that the four bands on the date hostilities were inaugurated by the Indians against the white settlers in 1862 were residing on their respective reservations on the south side of the Minnesota River, adjoining each other. The heretofore alleged landed interests of the bands in Minnesota had by successive treaties been diminished to these limits. In February, 1863, as hereinbefore appears, Congress passed an act annulling all treaties and forfeiting all the annuities of the offending Indians. The effect of the legislation was to forfeit all claims of the Indians theretofore subsisting and erected by former treaties and acts of Congress. Lone Wolf v. Hitchcock, supra. On March 3, 1863, 12 Stat. 819, at a time when a large majority of the plaintiff Indians were still hostile, and evidently prompted by a desire and intent to provide' for the permanent removal of the two bands of Indians to a distant point away from *331 the scenes and surroundings of the then existing warfare, as well as to attempt the civilization of the bands, Congress provided for the sale of their reservations on the Minnesota Liver, forfeited under the preceding act, and the investment of the proceeds by the Secretary of the Interior for the benefit of the Indians in setting them up in agricultural pursuits ■on their new reservation to he provided under the act.
The sale of the reservations began in 1865 and continued for many years, the amount finally realized reaching the total sum of $950,063.71. The record leaves no room for doubt that $206,753.61 of this total sum ivas expended by the Secretary for the joint benefit of the two bands, and it is beyond the range of possibility to apportion accurately the ■amounts expended for each band. On July 15,1870,16 Stat. ■361, Congress directed explicitly the manner in which the balance of the funds should be distributed, and the record conclusively establishes the observance by the Secretary of this act. The plaintiff Indians, if we correctly appraise their ■contention, insist that the proportionate distribution established by the act of 1870 should antedate the passage of the net itself, and apply with equal force to the distribution of the entire sum, thus creating the deficit of which they now ■complain. Laying aside the defense interposed that the entire sum was a mere gratuity given the Indians subsequent to the act of forfeiture and incapable of becoming the subject matter of a cause of action, we believe the claim without merit. There were no express terms in the act of 1863 which divested the Secretary of an exercise of discretion in expending the funds for the benefit of such Indians of the bands as were willing to adopt the pursuit of agriculture, and no hard and fast limitations imposed upon bim in any ■other respect.
The act of 1863 set apart a new home for the bands and those who were willing to go there and abide were to become the beneficiaries of the money to be received from the sale •of their former home. The bands themselves were depleted in ranks because of the Indian war, and apportionment in accord with numbers was impracticable. Later, in 1870, when peace had been established and the returning Indians were capable of enumeration, Congress adopted the method *332 of apportionment, and it was followed. There is nothing-in the act of 1870 of a retroactive effect, for the proviso thereto expressly makes it operative prospectively.
In seeking judgment for the value of 3,000,000 acres of land at $1.25 per acre, as alleged in item 6, said not to- have been properly included in the treaty of 1872, plaintiff Indians are obviously and concededly put to the necessity of attempting to vary the plain and unambiguous terms of a treaty, duly ratified in 1872, which specifically provided for the cession to the Government of not only the lands specifically described therein, but also “ all lands in the Territory of Dakota ” to which they had title or interest. Plaintiff' Indians early asserted ownership over an exceedingly large-acreage of territory lying in the northern portion of what subsequently became Minnesota and Dakota Territories. This claim was vigorously disputed by the Chippewa Indians, and frequent clashes ensued. In 1825 the Sissetons. and the Chippewas entered into an agreement respecting the division of the lands and fixed the boundaries thereof, and the boundary so fixed between them corresponds with substantial exactness to the northern boundary of the lands, described in Article II of the treaty of February 19, 1867,. 15 Stat. 505, all of which lands were sold and ceded by plaintiffs to the United States by the treaty of September 20,. 1872.
We have said that the plaintiffs in order to recover attempt to vary the plain terms of a treaty by parol testimony. While this is true, the contention goes much further, and we are asked to annul the treaty of 1872 upon the grounds of fraud and circumvention, said to be established by this-same class of testimony. The mere statement of the proposition is its own refutation. The plaintiffs in their brief concede that the decisions of the Supreme Court present insurmountable difficulties in the way of recovery, and seek to-overcome the same by a not unusual insistence in Indian cases that Congress conferred on this court an unique and sui generis jurisdiction, a grant of authority to go behind a consummated agreement as expressed in treaties and acts of' Congress and accept the utterly unreliable and vacillating self-serving statements of witnesses made a half century af *333 ter the event, impute fraud, misrepresentation, and all sorts of irregularities and dishonest conduct to those who negotiated and procured the same, a plenary authority to hold ancient treaties inoperative, unilateral, and oppressive. The claim under this item is especially in keeping with this emphasized and repeated contention. The treaty of 1872 (Kappler’s Treaties, Vol. II, p. 1057) unmistakably transfers to the United States all the title the Indians possessed to this tract, the extent of which the Indians were then, and are now, in more or less ignorance, as well as other lands to which they claimed title in the Territory of Dakota, the Government manifestly intending to acquire all outstanding lands claimed by them and conclude all controversy with respect thereto.
It would be a most remarkable situation if at the time the Indians were unaware that this acreage was not included in the treaty. One fact positively negatives the statement. The United States immediately took possession, opened the lands to public settlement, and this they did not do until after the treaty was legally concluded. As a matter of fact, Indian claims to immense territory at the time concerned always presented a matter of great indefiniteness, the Indian asserting title to all the lands over which he hunted, and it was not generally possible — in fact, not usual — to speak of the unlimited claims in terms of acreage. More comprehensive terms were employed, so as to embrace the total claim of the Indian tribe or band. Subsequently when these immense tracts were surveyed and definitely defined many conflicting statements emanated from the Indians challenging the correctness of concessions and grants. So it is with this claim. We can not attach credence to the testimony offered in this case. Assuredly we may not go behind the plain terms and conditions of a treaty and set it aside, when it is properly executed by the tribe or band, on the mere assertion of a few members of the tribe that it was not understood or assented to. Lone Wolf v. Hitchcock, supra.
In 1889 the Government entered into an agreement with the plaintiff Indians whereby the Indians disposed of all surplus lands, after individual allotments to them, contained in the Lake Traverse Reservation. This agreement was rati *334 fied and confirmed by act of Congress of March. 3, 1891, 26 Stat. 1035, section 26, and by its terms the Government obligated itself to pay $2.50 per acre for the lands so ceded, the total sum with 3 per cent interest thereon to be sub ject to appropriation by Congress for the benefit of the Indians in aid of their civilization, as provided in section 5 of the act of 1887, 24 Stat. 388. The agreement of 1889, as finally concluded in 1891, necessarily involved an estimate as to the acreage of surplus lands, for individual allotments were to be made, and while it was apparent that the individual allotments would not consume the total amount, it was likewise impossible to ascertain at the time with certainty how much' of the same they would take up. The Interior Department estimated from information available that the surplus lands would at least amount to 679,420 acres, whereupon Congress adopted the estimate and upon that basis appropriated $1,699,800, “ or so much thereof as may be necessary,” to meet the Government’s obligation under the agreement of 1891. Subsequent events proved the Government’s estimate of the acreage to be erroneous, and instead of there being a surplus of 679,920 acres the correct amount was 608,865.56 acres, a difference of 71,054.44 acres. Therefore the Government deducted from the amount theretofore appropriated a sum sufficient to cover this shortage, viz, $236,048.83, and judgment for this sum with interest, is claimed under this item.
The contention is predicated upon an assertion of unlawful allotments, the Indians claiming that the Interior Department, in disrespect of law and custom, enrolled a large number of persons who were not entitled to enrollment and thereby consumed this large additional acreage of surplus lands. In support of plaintiff’s effort one witness is produced who testifies that about 350 protests were made at the time of the enrollment, without identifying but one single family of Indians by name. It appears that the witness testifying was disgruntled over the whole proceeding, was not in sympathy with his fellow Indians as to the policy adopted by the band, and not only opposed the sale of the lands but declined to be identified with the agreement in any way. No other testimony is produced. We have cited this as a typical *335 instance, relied upon by the plaintiffs to procure a money judgment 30 years or more after tbe transaction. Experience as to Indian enrollments confirms the statement that no single event in Indian tribal life has so great a tendency to engender animosity and provoke controversy as the making of their rolls. The testimony of the single witness produced exemplifies the assertion. It is not claimed that the enlarged enrollment was not made up of Sisseton and Wahpeton Indians, but that members of the band should have been denied participation because not of the full blood. Congress has the power to provide a method of ascertaining citizenship in Indian tribes. Cherokee Nation v. Hitchcock, supra; Gritts v. Fisher, 224 U. S. 640. While under the jurisdictional act we have the power to adjudicate upon a proper record as to whether an act of Congress or agreement has been observed in accord with its terms and intent, we may not do so in the present instance for a decided lack of proof with respect thereto.
Item 8, Finding XIV, is a claim for reimbursement for the amount of an attorney’s fee paid to John B. Sanborn by the Secretary of the Interior on March 30, 1899. The gravamen of the complaint is that Sanborn’s contracts were with individual Indians and not with the band, and hence was not a legal charge against the latter. The fee was paid from the funds of the plaintiff band, and Sanborn’s employment originated in 217 contracts with individual Indians. Of this there can be no doubt. We had before us the same question in the case of Winton v. Mississippi Choctaws, 255 U. S. 373, and the Supreme Court held adversely to the plaintiff’s contention here. While the act of March 1, 1899, 30 Stat. 924, 946, is not so broad as the acts involved in the Winton case, still the principle is the same, and on the authority of that case the item fails.
Items 9 and 10, Findings XV and XVI. These items are so obviously devoid of merit that we think the findings fully explain them. The claim itself is concluded by the case of Lone Wolf v. Hitchcock, supra, a case almost exactly similar.
The petition will be dismissed. It is so ordered.
Gkaham, Judge; Hat, Judge; Downet, Judge; and Campbell, Chief Justice, concur.