1378

The UNITED STATES of
America, Appellant,

v.

The LOWER SIOUX INDIAN COM-
MUNITY IN MINNESOTA et
al., Appellees.

Appeal No. 17–74.

United States Court of Claims.

July 11, 1975.

Bernard M. Sisson, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for appellant; A. Donald Mileur, Washington, D. C., of counsel.

Marvin J. Sonosky, Washington, D. C., attorney of record, for appellee; Emerson Hopp, Minneapolis, Minn., of counsel.

Before COWEN, Chief Judge, MARKEY *, Chief Judge, and LARAMORE, Senior Judge.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

LARAMORE, Senior Judge:

On August 11, 1951, appellee filed five timely petitions with the Indian Claims

* Chief Judge of the U. S. Court of Customs and Patent Appeals, sitting by designation pursuant to 28 U.S.C. § 293(a).

Commission (hereinafter referred to as the "Commission") under the authority of the Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C. § 70. The fifth of those petitions, Commission Docket No. 363, contained two claims, the second of which was to become the predecessor of the claims now in issue. Prior to a final determination of the original claim for relief, the Commission permitted the appellees to amend their pleading. After making timely and adequate objection concerning the amended pleading, and upon a final determination of the merits, the appellant initiated this review of the law, as applied by the Commission in the present case. Jurisdiction enabling this appeal was predicated upon the stated act (25 U.S.C. § 70s).

A review of the history and events leading to the instant appeal will show the posture of the case.

By the Treaty of February 19, 1867, 15 Stat. 505, the United States recognized that title to the Devils Lake Reservation in North Dakota, a reservation defined and set aside by the treaty itself, to be in the Sisseton, Wahpeton and Cut Head (Yanktonais) Bands of the Sioux or Dahcotah Nation.[1] Notwithstanding the recognized title and possession, the bands' quiet enjoyment of the reservation lands was periodically disturbed by the appellant and its agents. Between 1867 and 1890 the military occupied and possessed more than 11,000 acres of the reservation, for the purpose of establishing and maintaining the Fort Totten Military Reserve. The development on Indian lands was done without tribal consent or payment of just compensation. In 1875 an erroneous survey, performed by appellant's agents, resulted in the exclusion of approximately 64,000 acres from the western boundary of the Devils Lake Reservation. The error was revealed in later years. The Secretary of the Interior, who had made an examination of the unfortunate circumstance, was constrained to report to the Commissioner of Indian Affairs, in a letter dated August 9, 1887, that:

> The boundary lines of the reservation have already been surveyed and established, and since that was done a large number of settlers have in good faith gone upon the lands lying west of the reservation line as established in 1875, believing them to be part of the public domain and have acquired rights thereon. In view of these facts, no change will be made in the western reservation line already established * * *.

Settlers had received patents to the land under the homestead and town-site laws. In addition, various parts of the 64,000 acres had previously been granted to North Dakota to be used for school and institutional purposes. The wrong had been done—the Gordian knot had been tied—the situation could not have been reversed. The only possible remedy, therefore, was to pay to the occupants of the Devils Lake Reservation money damages. Congress, thereupon, in the Act of March 3, 1891, 26 Stat. 989, 1010, appropriated $80,000 as compensation for the admitted taking.

Thereafter, the Indian Appropriations Act of March 3, 1901, ch. 832, 31 Stat. 1058, 1077, authorized the Secretary of the Interior to negotiate with "any Indians for the cession to the United States of portions of their respective reservations or surplus unallotted lands, * *."

---

1. The term "Sioux or Dahcotah Nation" was traditionally used to describe nomadic Indians of the midwest who spoke the Sioux or Dahcotah language and who lived in contiguous areas. The Sioux or Dahcotah Nation was comprised of seven major self-governing divisions (Mdewakantons, Wahpakootas, Sissetons, Wahpetons, Yanktons, Yanktonais and Tetons). Based on geographic location, the Mdewakantons, Wahpakootas, Sissetons and Wahpetons were collectively referred to as the Sioux of the Mississippi (or Sioux of Minnesota). *See, Sisseton and Wahpeton Band of Sioux Indians v. United States,* 58 Ct.Cl. 302 (1923). The Yanktons, Yanktonais and Tetons were the Sioux of the Missouri. *See, Sioux Tribe v. United States,* 500 F.2d 458, 205 Ct.Cl. 148 (1974). Yet, neither generic term may be conclusively presumed to include specifically those bands which are part of their definitional makeup. *Sioux Tribe v. United States, supra.*

Negotiated agreements would be subject to ratification by the Congress. Under the auspices of that act, a new and second agreement was concluded with the Indians of the Devils Lake Reservation. By the new agreement's terms, a major portion of the reservation would be ceded to the United States for a consideration of $345,000, while a small area would be reserved for future allotments to individual Indian families. The stated consideration was given not only on behalf of the exchange but, additionally, for settlement of any tribal claim growing out of the aforesaid erroneous survey of the western boundary, and any claim for loss of timber taken for the use of the military at Fort Totten from 1867 to 1890.

Congress never ratified the agreement. Instead, Congress passed the Act of April 27, 1904, 33 Stat. 319, which disposed of the property in question in a fashion distinct from the 1901 agreement. The 1904 Act ceded to the United States all unallotted lands of the Devils Lake Reservation, including the Fort Totten Military Reserve. The act also obligated the United States to grant the state of North Dakota certain parcels of said land for school purposes, save other parcels for the United States itself, to be given out thereafter for school, agency, church and mission purposes, and reserve other parcels for the establishment of a park to be known as Sullys Hill. The act additionally directed an allotment of land be made to each Indian on the reservation[2] and that the unallotted remainder be disposed of under the homestead laws.[3] The act directed that land which would be sold pursuant to the homestead laws would be priced at $4.25 per acre, and lands reserved for schools, churches and missions would be priced at $3.25 per acre. The President had the authority to lower the homestead acreage price if such would be requisite to selling the designated land. No provision was made in the act as to payment for the land to be used as the Sullys Hill public park. The United States was therein designated as trustee for the Indians in disposing of the land and was to pay the proceeds of the sale to the Indians.

Pursuant to the Act of August 13, 1946, *supra*, appellees filed the two-part claim in Docket No. 363.[4] Docket No. 363 was captioned "Claims Relating to Treaty of June 19, 1858, for General Accounting and Other Relief." The first claim stated therein was for the value of land reserved for appellees in the 1858 Treaty. The "Second Claim," the procedural handling of which is the subject of contention in this appeal, alleged that the United States by virtue of various treaties, statutes and administrative acts, "has been obligated to pay various sums in money and goods to the petitioners * * * and has managed and disposed of property * * * belonging to the petitioners." Further, that the said United States "sold * * * property, including lands, belonging to the petitioners in an improvident manner; * * [h]as taken unto itself lands and other property belonging to the petitioners" and has profited along with its non-Indian citizens at the expense of the petitioners "by its management and control of petitioners' funds and property; * * *." Finally, that "[a]ll of the records of the defendant's transactions in connection with the petitioners' funds and property * * * are in the exclusive custody and control of the defend-

2. The right of individual members of the tribes to land allotments stems from the Act of February 8, 1887, 24 Stat. 388, and the Act of February 28, 1891, 26 Stat. 794. *See also*, Act of March 3, 1863, 12 Stat. 819.

3. Based on the Commission's record, we have concluded that the total acreage figure for the Devils Lake Reservation was about 182,000 acres in 1904. A total of 6,160 acres went to 61 Indians of the reservation who had not yet been allotted land as had been required by previous treaties. *See*, n. 2, *supra*.

4. At the time of filing the claims in Docket No. 363, the appellees filed four other petitions, all of which made a claim for the value of land, and two of the four being claims for Fifth Amendment taking. Those petitions were designated in Commission Docket Nos. 359 through 362.

ant." Wherefore, the appellees asked for a "full and complete disclosure, accounting and report [and] for such sums and the value of lands or other property which may be found by [the] Commission to be due * * * [and] [f]or such other relief as * * * may [be] deem[ed] just * * *."

In June of 1967, the Government Services Administration (hereinafter referred to as "GSA") filed its report pertaining to the interests of appellees in the litigation then pending before the Commission. The report was complete except it did "not contain an accounting of all petitioners' funds as requested in the Second Claim of Document No. 363; nor does it contain statements of gratuity payments made on behalf of petitioners. A report, or reports, on these items is being prepared and will be submitted at a later date." General Services Administration, "Re: Petitions of the Lower Sioux Indian Community in Minnesota, Indian Claims Commission Nos. 359, 360, 362, and 363," at page 2.

In 1967, a settlement was reached by the parties in all the then pending dockets except for the Second Claim in Docket No. 363. Paragraph 9 of the Stipulation for Settlement and Stipulation for Entry of Final Judgment, Docket Nos. 142, 359 through 363, provided that entry of the judgments as set forth therein:

> * * * shall finally dispose of all rights, claims or demands, which the plaintiffs in those dockets * * * have asserted, or could have asserted, with respect to the subject matter of the cases and the plaintiffs in each of those dockets * * * shall be barred thereby from asserting any such rights, claims, or demands against the defendant in any other, or future, action or actions, except as to the general accounting claim in Docket No. 363, as identified in Paragraph No. 13 of this stipulation. [See, Sisseton and Wahpeton Bands v. United States, 18 Ind.Cl.Comm. 477, 480 (1967).]

Paragraph No. 13 of the Stipulation reads, in part:

> * * * the only remaining claim in Docket No. 363 will be the claim denominated "Second Claim" in the first amended petition in Docket No. 363 for an accounting and report by the defendant as to the claimants' property and funds. [See, Sisseton and Wahpeton Bands, supra at 481.]

Final proceedings concerning Docket No. 363, Second Claim, were obviously awaiting the GSA accounting and report that was being finalized.

It appears from an examination of the record that the awaited report was transmitted to the parties on June 23, 1967, approximately one month after the settlement agreement had been entered into by the parties.

On October 6, 1969, after stating their exceptions to the final GSA report, appellees filed a pleading entitled "Motion for Leave to Sever from Docket No. 363 Claims Identified as Docket No. 363A and Docket No. 363B." Based on the contents of the Second Claim of Docket No. 363, the appellees restated the alleged wrongs as two separate claims for relief. The first, found in Docket No. 363A, had as its plaintiffs the Sisseton and Wahpeton Tribes of North Dakota and claimed the taking of the Devils Lake Reservation of North Dakota by the appellant through the Act of April 27, 1904 (33 Stat. 319). The second, found in Docket No. 363B, had as its plaintiffs the Sisseton and Wahpeton Tribes of North Dakota and the Sisseton and Wahpeton Tribes of South Dakota. Docket No. 363B complaint prayed for the fair market value of land ceded by several other treaties and agreements between the United States and the appellees. The Commission concluded, on December 10, 1969, that the language of the Second Claim of Docket No. 363 was broad enough to include the two newly-stated claims and, therefore, allowed the amended petitions to be filed over the objection of the appellant that the claim was barred by limitations (22 Ind.Cl. Comm. 226). (In its written briefs and oral argument before this court, the appellant has additionally raised the issue

of *res judicata* as to the issues presented in Docket No. 363A based on the 1967 settlement. The disposition of that defense will be discussed in Part II of this opinion.)

On January 21, 1970, the Commission ordered separate trials in Docket Nos. 363A and 363B.[5] The recognized title claim for the value of the Devils Lake Reservation (Docket No. 363A) was tried on May 14, 1971, both as to title and value. On June 30, 1973, the Commission decided that the United States recognized the title of the appellees by the Treaty of February 19, 1867 (*Lower Sioux Indian Community in Minnesota v. United States*, 30 Ind.Cl.Comm. 463 (1973)).

That proceeding divided the land into six categories for valuation purposes, as follows:

1. Claim for use of 11,420 acres for a military reserve (1867–1890).

2. Claim for 64,000 acres excluded from the reservation by erroneous survey in 1875.

3. Claim for Sections 16 and 36 in each township of the reservation, or lands in lieu thereof, granted to the State of North Dakota by Section 5 of the Act of April 27, 1904, c. 1620, 33 Stat. 319.

4. Claim for not to exceed 900 acres reserved for church, mission, and agency purposes and 1,600 acres reserved for the Fort Totten Indian School, under Section 4 of the Act of April 27, 1904, *supra.*

5. Claim for 960 acres the President reserved for a public park by proclamation dated June 21, 1908, pursuant to Section 4 of the Act of April 27, 1904, *supra.*

6. Claim for all the unallotted lands of the Devils Lake Indian Reservation, including the Fort Totten Military Reserve, disposed of under the general provisions of the homestead and town-site laws of the defendant, at prices fixed by the 1904 Act, pursuant to Section 4 of the Act of April 27, 1904, *supra*, excepting lands identified in Items 2 through 5 above.

The Commission concluded that there was a Fifth Amendment taking of the six items by the appellant, under the doctrine of *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 390 F.2d 686, 182 Ct.Cl. 543 (1968). Valuation was determined, and final judgment was entered February 27, 1974 (*Lower Sioux Indian Community in Minnesota v. United States*, 33 Ind.Cl. Comm. 389 (1974)).

The issues presented in this appeal are as follows: (1) Whether the original Docket No. 363, Second Claim, was sufficiently broad to permit the amended claim in Docket No. 363A, and (2) Whether the issue of *res judicata* is before the court for review and, if so, whether it is a valid bar to the action as presented in Docket No. 363A.

For reasons stated herein, we answer issue (1) in the affirmative; the first part of issue (2) in the negative. Given our decision concerning the first part of issue (2), an answer to the second part of issue (2) is not required.

I.

The Indian Claims Commission was created to hear and determine a very broad category of claims that may have accrued to the various constituents of Indians extraction against the United States since the beginnings of our American history, "notwithstanding any statute of limitations or laches," 25 U.S.C. § 70a. The enactment itself, though, limits jurisdictionally the time within which claims must be filed to be heard by the Commission or, for that matter, any authority, 25 U.S.C. § 70k reads:

---

5. Docket No. 363B, the aboriginal title claim and the Fifth Amendment taking claim was tried in October of 1970 on the issue of aboriginal title. The appellant, herein, has informed this court that the case has "been briefed and is now under submission to the Commission." [Appellant's Brief on Appeal to this court, p. 6.]

The Commission shall receive claims for a period of five years after August 13, 1946, and no claims existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress. Aug. 13, 1946, ch. 959, § 12, 60 Stat. 1052.

In effect, pre-August 13, 1946 causes of action were either presented before August 13, 1951 or forever relinquished.

The original petition, Docket No. 363, Second Claim, was filed within the requisite time.[6] The crux of the issue at bar is whether the amendment to the original petition as stated in Docket No. 363A, filed on October 6, 1969, a date after the jurisdictional time for filing had elapsed, is to be permitted to relate back in time to the initial filing date. If the amendment is permitted to relate back to the original date of filing, the Commission then had the authority to examine the merits of the claim as stated in the amended petition. If the amendment is not permitted to relate back to the original date of filing, the Commission then did not have the authority to examine the merits of the claim as stated in the amended petition, but would then have only the power to examine the claim as stated in the original presentment.

The proper application of the law in determining whether a claim, as stated in an amended petition, is timely or not was explained in *Snoqualmie Tribe of Indians v. United States*, 372 F.2d 951, 178 Ct.Cl. 570 (1967). In *Snoqualmie* we noted that section 70k, 25 U.S.C., "bars claims existing before August 13, 1946, 'but not presented within' five years thereafter." 372 F.2d 951, 960, 178 Ct.Cl. 570, 586. The key to the inquiry, we determined, was whether the newly-stated claim had been "presented" in the original petition. After a determination that a liberal construction was required by the remedial nature of the Indian Claims Act (*United States v. Seminole Nation*, 173 F.Supp. 784, 146 Ct.Cl. 171 (1959); *Otoe and Missouria Tribe of Indians v. United States*, 131 F.Supp. 265, 131 Ct.Cl. 593 (1955), *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755), we construed the word "presented" to mean that the adverse party be given formal and reasonable notice that a claim is being asserted against it. *Snoqualmie Tribe of Indians v. United States, supra.*

The review, therefore, must determine if the defendant was apprised or *notified* of the situation to which it may be held responsible. "In other words, the inquiry [test] in a determination of whether a claim should relate back will focus on the notice given by the general * * * situation set forth in the original pleading." *Snoqualmie Tribe of Indians v. United States*, 372 F.2d 951, 960, 178 Ct.Cl. 570, 587 (1967).

In reaching the above rule of construction we simultaneously examined the Commission's Rule 13(c) which by its terms permits certain amended pleadings to relate back to the date of the original pleading. Commission Rule 13(c) states:

Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

The rule, as does the statute, requires the test of notice if circumvention of a time limitation is to be permitted on the theory of relation back. In fact, the rule defines that notice, permitting "relation back," is present only if the amendment arose out of the same "conduct, transaction, or occurrence" as presented in the original pleadings.[7] The *Snoqualmie* case has been affirmed and followed by

---

6. Albeit, just barely, the petition in Docket No. 363 was filed on August 11, 1951. The last day in which filing would have been permitted was August 13, 1951.

7. It should be pointed out that the Commission Rule 13(c) is identical to our Rule 39(c) and the Federal Rules of Civil Procedure 15(c). *See, Snoqualmie Tribe of Indians, supra*, at 960, 178 Ct.Cl. at 587, n. 5.

other cases determining the validity of an amended petition permitted by the Commission. *Sioux Tribe v. United States*, 500 F.2d 458, 205 Ct.Cl. 148 (1974); *United States v. Northern Paiute Nation*, 393 F.2d 786, 183 Ct.Cl. 321 (1968).

In the present case, the Second Claim pleaded in the original petition was drafted in very broad terms.[8] The obvious intention of the claim was to thereby encompass any claims that the appellees might have against the appellant. In so doing, we can say without hesitation that language was used in the original petition which should have put the appellant on notice as to the transactions and occurrences that appellees could rely upon to claim that certain lands of the appellees were taken by the government. A close examination of some of the pleadings as set forth in Docket No. 363, Second Claim, with the pleadings of Docket No. 363A,[9] will show how em-

8. The Second Claim in Docket No. 363 is reproduced herein for the examination of the reader:

SECOND CLAIM

"14. Under and by virtue of various statutes, treaties and administrative acts, the defendant has been obligated to pay various sums in money and goods to the petitioners, has invested and held for investment various funds belonging to the petitioners, and has managed and disposed of property, both real and personal, belonging to the petitioners.

"15. In the course of its management and control, the defendant at various times:

"(1) Has paid out sums belonging to the petitioners to persons not entitled to receive the same;

"(2) Has sold, rented or otherwise alienated property, including lands, belonging to the petitioners in an improvident manner;

"(3) Has unlawfully induced the petitioners to consent to the use of their funds for the payment of alleged debts never incurred by the petitioners;

"(4) Has taken unto itself lands and other property belonging to the petitioners;

"(5) Has profited at the expense of the petitioners by its management and control of petitioners' funds and property;

"(6) Has enabled its non-Indian citizens to profit at the expense of the petitioners by the defendant's management and control of petitioners' funds and property.

"16. All of the records of the defendant's transactions in connection with the petitioners' funds and property including lands are in the exclusive custody and control of the defendant. The defendant has never disclosed to the petitioners the manner in which it has carried out its obligations to the petitioners and has never rendered to the petitioners an accounting of such obligations.

"WHEREFORE, the petitioners pray:

"(1) For a full and complete disclosure, accounting and report as to all of petitioners' property, both real and personal, which has come into the possession of the defendant and as to all funds payable to the petitioners by the defendant;

"(2) For a judgment as their interests may appear for such sums and the value of lands or other property which may be found by this Commission to be due to the petitioners;

"(3) For such other relief as this Commission may deem just, and which is consonant with fair and honorable dealings."

9. The essential parts of the amended pleading, Docket No. 363A, are reproduced herein for the examination of the reader:

"6. By the Act of April 27, 1904, *supra*, the United States, without the consent or agreement of the Band, took property of the Band as follows:

"a. All of the unallotted lands of the Devils Lake Indian Reservation, including the Fort Totten Military Reserve, for disposal under the general provisions of the homestead and townsite laws of the defendant, at prices fixed by the 1904 Act, excepting from such disposal, 6,160 acres required for future allotments and excepting lands identified in subparagraphs b, c, and d below. (Sec. 4.) The taking was as of the dates of the patents.

"b. Sections 16 and 36, or an equivalent of two sections in each township of the reservation, to be paid for by the United States at the rate of $3.25 per acre as fixed by the 1904 Act, and simultaneously granted by the defendant to the State of North Dakota. (Sec. 5.) The taking was as of the date of the 1904 Act, or as of the dates title passed to the State of North Dakota, i. e., the dates of approval of the surveys of the school sections or lieu lands.

"c. Lands, not to exceed 900 acres, for church, mission and agency purposes and two and one-half sections of land reserved for the Fort Totten Indian School, to be paid for by the United States at the rate of $3.25 per acre as fixed by the 1904 Act. (Sec. 4.) The taking was as of the date of the 1904 Act, or as of the dates the reserves were identified and set aside.

"d. A tract of about 960 acres that the President was authorized to reserve for a public park. The tract embraced Sullys Hill in the northeastern portion of the abandoned military reservation. (Sec. 4.) By Proclamation dated

bryonic the original pleading was to the amended pleading. Paragraph 14 of Docket No. 363, Second Claim, states that the defendant "has invested and held for investment various funds belonging to the petitioners, and has *managed and disposed of property, both real and personal, belonging to the petitioners.*" [Emphasis added.]

Paragraph 6(a), of Docket No. 363A pleadings, claims that a wrong was committed upon the appellees when the Act of April 27, 1904, *supra*, took "[a]ll of the unallotted lands of the Devils Lake Indian Reservation * * * for disposal under the general provisions of the homestead and town-site laws of the defendant, at prices fixed by the 1904 Act * * *." We think the broad, but permissible,[10] allegation of the paragraph 14 claim was adequate notice of the more specific Docket No. 363A paragraph 6(a) claim, amended after the appellees had received their copy of the GSA accounting and report.

Paragraph 15, clause (2) of Docket No. 363, Second Claim, states that in the course of its management and control the defendant "[h]as sold, rented or otherwise alienated property, including lands, belonging to the petitioners in an improvident manner." Paragraphs 6(b) and (c) of Docket No. 363A are comparable in that they state claims for lands which the United States, through the Act of 1904, granted to the state of North Dakota and various other churches, schools and agencies, land which belonged to the appellees. Further, that such transactions were compensated for, but that the compensation granted therein was wholly unconscionable. Once again we see no other distinction in the two pleadings other than the fact that Docket No. 363A pronouncements are more definite as to specifics than the Docket No. 363, Second Claim statements, a practice which is not condemnable under modern notions of pleadings. *See* n. 10, *supra.*

We hold that the original petition in Docket No. 363, Second Claim, gave fair and adequate notice to the government of the transactions and occurrences that were later more specifically claimed in Docket No. 363A. The action of the Commission, permitting the amended complaint, was proper and it thereby had the authority to make a determination as to the merits of the claims stated in Docket No. 363A. (*See, Yankton Sioux Tribe v. United States,* 175 Ct.Cl. 564 (1966) for a similar conclusion on compa-

June 21, 1908, the President reserved the 960 acres. The taking was of the date of the 1904 Act, or as of June 21, 1908.

"The 1904 Act directed that the proceeds from the disposition and acquisition of the land under subparagraphs a, b, and c above, be paid to the Indians of the Devils Lake Indian Reservation. (Sec. 6.) By Section 17 of the Act of April 4, 1910, c. 140, 36 Stat. 269, 279, Congress appropriated $3,120, representing $3.25 per acre for the 960 acres identified in subparagraph d above.

"WHEREFORE, judgment for the Sisseton and Wahpeton Band of Sioux Indians of North Dakota, is prayed as follows:

"1. For the fair market value of the lands taken, as of the date or dates of taking, plus just compensation, measured in terms of interest at not less than 5% per annum from the date or dates of taking, less any payment made by the United States.

"2. For such other relief as may be just and equitable and fair and honorable under the Indian Claims Commission Act."

10. We take notice of the fact that Rule 7(a), General Rules of Procedure, Indian Claims Commission, this court's Rule 32(a) and the Federal Rules of Civil Procedure 8(e)(1), are substantively the same. As to interpretation of the Federal Rule 8(e)(1), the courts have held, that the fact that an [original] pleading is general and not specific does not jeopardize the validity of the complaint. The purpose of a complaint is to give "fair notice * * * of the nature and basis of the claim asserted and a general indication of the type of litigation involved." [*Continental Collieries, Inc. v. Shober,* 130 F.2d 631, 635 (3d Cir. 1942).] Wherever additional facts are necessary to prepare for trial the various forms of discovery will be available to fill the void. *Burriss v. Texaco, Inc.,* 361 F.2d 169 (4th Cir. 1966); *Leas v. General Motors Corp.,* 278 F.Supp. 661 (E.D. Wis.1968).

**1386**

rable facts, decided prior to the *Snoqualmie* case, *supra.*)

In our holding, we have determined that the original pleading had sufficiently apprised the government of the transactions and occurrences which it would be required to defend itself against. We thereby allowed the amended pleading. The government in its brief and in oral argument before this court contended that appellees should not now be permitted to claim a Fifth Amendment taking after presenting it for so many years as a demand for an accounting.

We cannot agree that the Docket No. 363, Second Claim, was a demand for an accounting and nor more. To begin with, the title to the pleadings reads "Claims Relating to Treaty of 1858 for General Accounting *and other Relief.*" [Emphasis added.] Although the appellees were obviously thinking that the situation which they were addressing in the petition could be solved by an accounting, they seemingly realized that future proceedings would produce a greater understanding of the nature of the occurrence stated in the petition, and that such in turn may change the relief that must be prayed for in the petition. In their wisdom they so provided for themselves. After a careful reading of the substance of the pleadings (which is unquestionably more determinative to an understanding of the nature of the complaint—but in this case both prove our point), we conclude that appellees, although believing that an accounting would be an appropriate remedy, were not limiting themselves to that alone.

The government also asserted that an accounting cannot mushroom into a Fifth Amendment taking against the United States, since the United States cannot act as a fiduciary (holding land in

trust for the Indians) and a sovereign (exercising the power of eminent domain). *Fowle v. Lawrason*, 30 U.S. (5 Peters) 495, 8 L.Ed. 204 (1831). On behalf of this statement, the appellant cites *Three Affiliated Tribes of the Fort Berthold Reservation v. United States, supra* at 691, 182 Ct.Cl. at 553. The citation refers to this court's discussion of Congress' plenary power to manage and control tribal Indian affairs, including their lands and funds. A spate of cases is cited therein to support that power. After, but not covered by, the given citations, the court in *Three Affiliated Tribes of the Fort Berthold Reservation, supra* at 691, 182 Ct.Cl. at 553, states:

It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution * * *.

In light of our determination that the petition prayed for relief under an accounting *and* for a Fifth Amendment taking, and since alternative pleadings are permitted (General Rules of Procedure, Indian Claims Commission, section 7(a)(2)),[11] we have no need to confront the issue of whether the government can wear two hats, and be, at the same time, a trustee for the benefit of the Indians' land, and a sovereign exercising eminent domain upon the same Indian land.

■ The government has additionally asserted, under the first issue of this case, that the facts in this case had been previously litigated (*Sisseton and Wahpeton Indians v. United States*, 58

11. Commission Rule 7(a)(2) reads, in part:
"* * * A party may also state as many separate claims or defenses as he has, regardless of consistency and regardless of the nature of the grounds on which they are based."

Ct.Cl. 302 (1923),[12] *cert. denied,* 275 U.S. 528, 48 S.Ct. 20, 72 L.Ed. 408 (1927), after passage of a special act authorizing appeal, *aff'd on appeal,* 277 U.S. 424, 48 S.Ct. 536, 72 L.Ed. 939 (1928)), that the appellee knew this case's specifics at the time of the filing of the original petition and did not need the GSA report and accounting to file a more concise and direct pleading. Again, we do not agree. The issue of whether the *Sisseton and Wahpeton Indians'* case, *supra,* shows prior knowledge on the part of the appellees of the facts of this case, was never presented to the Commission as a reason for denying the amended pleading. A defense neither pleaded nor proved, or in some other way demonstrated in a proper manner before the Commission, is waived on appeal to this court. *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 203 Ct.Cl. 426 (1974). Even if we permitted the issue of the previous litigation to be raised to show knowledge of more specifics we would have to find against the government. The government had all the information (all records as to all accounts held on behalf of appellees) in its possession. The appellees had none, until the GSA report was filed in 1967. A careful reading of the prior litigation reveals that there was no showing in the report that any knowledge as to the extent and handling of the appellees' accounts was revealed by the government. In fact, it seems that the Indians knew really very little about their state of financial being. (What they did know and plead therein was that the government under various statutes and treaties was in charge or control of accounts held on their behalf.) Since the then appellees did not receive judgment in the

case, we cannot now presume that they were ever fully apprised of their situation until the GSA accounting and report of 1967. What we can say is that once they had that report, they became aware that the Docket No. 363, Second Claim, could be better stated. We conclude that the obvious realities of the situation show that the accounting and report gave appellees a better understanding of the case at bar, an understanding that appellant, we may presume, had since it was in control of the records.

We, therefore, allow the amendment under Commission Rule 13(c).

## II.

■ The issue has been presented to this court on appeal, by the appellant, that the claim for the Fifth Amendment taking of the Devils Lake Reservation land is *res judicata* under the consent judgment enforcing the settlement agreement. Before this court could ever reach a determination of the validity of that contention we would first have to overcome the reply contention of the appellees that the issue is not properly before this court. After a scrutinous examination of the record and the law we come to the conclusion that the appellees' reply to the issue is tenable.[13] We, therefore, cannot entertain the issue presented by appellant.

The defense of *res judicata* that the government raises before this court, and the assertions and arguments that the government makes in its brief, were never before presented in this case.[14] In

12. Jurisdiction for the court's consideration of the claim reported at 58 Ct.Cl. 302, was granted in the Act of April 11, 1916, 39 Stat. 47. Jurisdiction was therein limited to rights which may have accrued under treaties and acts of Congress. The present suit is on a theory of Fifth Amendment taking. *See, Lower Sioux Indian Community in Minnesota v. United States,* 30 Ind.Cl.Comm. 463, 466–469, as to argument of *res judicata. See,* n. 14, *infra.*

13. Although appellees' basic contention is accepted by this court, we base our decision on cases and rules of procedure substantially distinct from those propounded by appellees in their brief before the court.

14. The government's *res judicata* argument to the Commission was made on the claim for a Fifth Amendment taking of the 64,000 acres excluded by the erroneous survey of 1875. Reference was made based on the case of

short, the issue of *res judicata* was not properly presented, litigated or adjudicated below.

The appellant, on the other hand, contends that it did present the question of *res judicata* under the consent judgment.

*Sisseton and Wahpeton Indians v. United States, supra.* The Commission passed upon the contention notwithstanding the fact that the issue of *res judicata* was not raised by pleading or in pre-trial hearings, and no argument or evidence was presented during the proceedings to support the government's contention. The Commission's opinion on the point was stated in 30 Ind.Cl.Comm. 463, 466–469, and is reproduced herein for reference and distinction as to the contention at bar:

"The defendant also asserts that the claim for a Fifth Amendment taking of approximately 64,000 acres [footnote 1 omitted] excluded by the erroneous survey of 1875 is *res judicata*. Defendant refers to *Sisseton and Wahpeton Indians v. United States,* 58 Ct.Cl. 302 (1923), *cert. denied,* 275 U.S. 528, 48 S.Ct. 20, 72 L.Ed. 408 (1927), *aff'd on appeal,* 277 U.S. 424, 48 S.Ct. 536, 72 L.Ed. 939 (1928), and states that the present plaintiffs filed the petition in the Court of Claims pursuant to a special jurisdictional act of Congress approved April 11, 1916, 39 Stat. 47; and that the issues in that action were the same as those in issue herein.

"On March 17, 1917, the Sisseton and Wahpeton Bands filed a petition in the Court of Claims pursuant to the aforesaid jurisdictional act. The petition included several claims, among them a claim based on the loss of the 64,000 acres excluded from the Devils Lake Reservation by the erroneous survey of 1875. The court dismissed the petition for reasons more particularly discussed hereafter.

"The defendant refers to the finding by the Court of Claims that plaintiffs had been paid $1.25 per acre, or $80,000.00, for the 64,000 acres of land. The court also found plaintiffs had been paid $421,850.21 up to 1917 for loss of the unallotted lands of the Devils Lake Reservation, as well as for the claim growing out of the erroneous survey and timber taken from the reservation by the Military Forces of the United States. Such payment was made pursuant to an agreement between the bands and the United States on November 2, 1901, which was 'amended and confirmed' by the Act of April 27, 1904, 39 Stat. 47 [*Sic,* 33 Stat. 319.] The Court of Claims concluded that the claim for the value of the erroneous survey lands was without merit for the reason that the bands had already been paid twice for this portion of the claim.

"The Commission finds that res judicata does not apply here. The aforesaid jurisdic-

The government admits that it was raised "*sub silentio,*" but that such was sufficient to preserve the point for appeal. On behalf of the *sub silentio* argument the government points to the following statements of its counsel, which were found in the record. First, in "De-

tional act of Congress, conferring jurisdiction on the Court of Claims to hear, determine and render judgment in claims of the Sisseton and Wahpeton Bands of Sioux Indians against the United States, provided, among other things, as follows:

'* * * That all claims * * * shall be submitted * * * for the amount due or claimed to be due said bands from the United States under any treaties or laws of Congress; and jurisdiction is hereby conferred upon the Court of Claims to hear and determine all claims of said bands against the United States and also any legal or equitable defense, set-off, or counterclaim which the United States may have against said Sisseton and Wahpeton bands * * * 39 Stat. 47.' [*Sic,* Act of April 11, 1916]

"The Court of Claims stated in *Sisseton and Wahpeton Indians, supra,* at page 329, as follows:

'The plaintiff Indians manifestly misapprehended the scope and character of the jurisdictional act and the limitations of the court thereunder * * * Our jurisdiction is limited to rights which may or may not accrue under treaties and acts of Congress. When Indian rights of property are fixed by the terms of treaties and statutes we are bound to accept them as so fixed. * * *'

"The Commission finds that the jurisdictional act conferring jurisdiction on the Court of Claims in *Sisseton and Wahpeton Indians, supra,* was strictly construed by the court to cover only those claims which might arise under the terms of treaties or laws of Congress; and that a decision regarding claims thereunder asserted cannot be res judicata in connection with the instant claim filed under the Indian Claims Commission Act of 1946 for just compensation based not on laws or treaties, but on a Fifth Amendment taking. *Creek Nation v. United States,* 168 Ct.Cl. 483, 495 (1964).

"Since we are able to dispose in this way of the defense of res judicata raised by defendant, we need not deal with the question raised by plaintiff of the effect of the pretrial order on the subsequent course of action of the case. (The case was tried on the issues and facts set forth in the pretrial order of March 25, 1970. The issue of res judicata was not raised at the pretrial hearing or at the trial, and no argument or evidence was previously offered to support defendant's contentions.)"

fendant's Response and Memorandum to Motion for Leave to Sever from Docket No. 363, Claims Identified as Docket No. 363A and 363B" the appellant (government) stated, in part:

All of these claims [Docket Nos. 142 and 359–363, inclusive] were tried upon the questions of liability and land value. *Sisseton and Wahpeton Bands et al. v. United States,* 10 Ind.Cl. Comm. 137 (1962), modified 163 Ct.Cl. 329 (1963). After determination of liability, but before the Commission reached a decision upon value, such claims were compromised and settled by payment by defendant for the sum of $12,250,000. *Sisseton and Wahpeton Bands et al. v. United States,* 18 Ind.Cl.Comm. 477 (1966). The accounting claim (Docket No. 363, second claim) was not included in the settlement negotiations because at the time of settlement the accounting report had not been received from the General Services Administration.

The claims alleged in proposed Docket Nos. 363–A and 363–B are of the same type as made in Docket Nos. 142 and 359–363, inclusive, and already settled by compromise  *  *  *.

Second, the government shows that at oral argument on appellees' motion on November 20, 1969, counsel for the government opened his argument by stating:

May it please the Commission, this [is] an accounting action and it has been referred to always as an accounting action and even in the settlement proceedings that we had previously which have been referred to here, it was referred to as a general accounting action which was accepted [excepted] from that settlement. That settlement [was] comprised of several land claims, several large land claims that these same petitioners presented and which have been disposed of.

This has always been referred to as the accounting action. Now, as Mr.

Sonosky has already stated, these cases, one 363A and one 363B, 363A is a claim based on alleged unlawful taking of land. The other one which Mr. Sonosky has already stated is based on alleged unconscionable consideration made for some 11 million acres of land. That also is a land claim. [Brackets were supplied by the appellant in its reply brief.]

In conclusion, the government asserts that it was not necessary to use any magic words such as *res judicata* to assert the defense.

Commission Rule 11(b) states, in part:

*  *  *  Every defense to a claim for relief  *  *  *  except a counterclaim or set-off by the United States, shall be asserted in the responsive pleading thereto if one is required  *  *  *.

On the same point (affirmative defenses) this court's Rule 37(b) states:

In pleading to a preceding pleading, a party shall set forth affirmatively  *  *  *  *res judicata*  *  *  *  and any other matter constituting an avoidance or affirmative defense. [Emphasis added.]

Federal Rules of Civil Procedure, 28 U.S.C. rule 8(c) is exact in comparison with our rule.

The Supreme Court has recently stated:

*Res judicata* and collateral estoppel are affirmative defenses that must be pleaded. Fed.Rules Civ.Proc. 8(c). The purpose of such pleading is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate. [*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971).]

Appellant not only failed to plead *res judicata,* but failed to include the issue in the pre-trial order, present evidence of the plea at trial, or in any other manner *affirmatively* present the issue to the Commission. The government comes now, to this court, and relies on elusive phraseology and cries out, *"sub silentio."* We lack knowledge of any rule of law which would permit the appellant to so niggardly state a defense (which otherwise would require demonstrative extrapolation), fail to raise it before the Commission, and then contend the issue upon appellate review.[15] On the contrary, we are aware of an abundance of case law stating otherwise.

This court cannot review what the Commission did not decide and contrary to procedural requirements was not asked to decide. In fact, we are without authorization to make such a review. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra,* 402 U.S. at 350, 91 S.Ct. 1434; *McCullough v. Kammerer Corporation,* 323 U.S. 327, 328, 65 S.Ct. 297, 89 L.Ed. 273 (1945); *Turtle Mountain Band of Chippewa Indians v. United States, supra.*

The decision of the Indian Claims Commission is

*Affirmed.*

---

15. Appellant's cases, which are cited on behalf of its contention, are all quite readily distinguishable. *Imperial Insurance Inc. v. Employers' Liability Assurance Corp.,* 143 U.S.App. D.C. 173, 442 F.2d 1197, 1201 (1970) concerns review of instructions presented to a jury at trial, not procedural requirements of affirmative defenses. In any event, in *Employers', supra,* the court accepted the appeal because there was a "full exchange between court and counsel at which *Employers'* position had been rejected." In *United States v. Barndollar & Crosbie,* 166 F.2d 793, 796 (10th Cir. 1948) there was no formal taking of exception to findings of fact. The court ruled that such would not be necessary if the objection was made "known". We doubt very much that appellant, through its quoted sentences, made it "known" to all parties that it was contending *res judicata.* The standard for taking exception to findings of fact, in any case, is different and probably less strict than the standard for affirmative pleading. In *United States v. Harue Hayashi,* 282 F.2d 599, 601 (9th Cir. 1960) it was contended that a motion for a new trial should have been made prior to any appeal on an award of damages. It was held, based upon an analysis of the Federal Rules of Civil Procedure, 28 U.S.C., that such was not necessary and, in any case, an objection was made to the award granted. Finally, in *Lipman v. Arlington Seating Co.,* 192 F.2d 93 (7th Cir. 1951), the court determined that a defendant was not required to request a specific finding on lack of mutuality in order to raise the defense on appeal. Fed.R.Civ.P. 52(a). In non-jury cases, *requests for findings* are not necessary for review. Objection to all adverse findings may be presumed. We cannot presume *res judicata* unless specifically referred to.