**DEVILS LAKE SIOUX TRIBE, Appellant,**

v.

**STATE OF NORTH DAKOTA; The Garrison Diversion Conservancy District; the United States of America; 101 Ranch, a North Dakota Partnership; Steve Ward; Imogene Christensen; Claire Engelhardt; Carlyle Brye; Arnold and Vernyll Yri; Ernest and Ruby Martinson; Miles Maddock and Dorothea Maddock; Olaf Solheim and Mabel Solheim; Leo Johnston and Minnie Johnston; Francis P. Schneider and Gloria Schneider, Appellees.**

**No. 89–5332.**

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1990.
Decided Oct. 23, 1990.

Robert Pirtle, Seattle, Wash., for appellant.

George W. Van Cleve, Washington, D.C., for appellees.

Before FAGG, Circuit Judge, and BRIGHT and HENLEY, Senior Circuit Judges.

BRIGHT, Senior Circuit Judge.

The Devils Lake Sioux Tribe (the Tribe) appeals a district court order granting the United States' motion for summary judgment and dismissing its complaint against the United States, North Dakota, the Garrison Conservancy District and several littoral land owners in this quiet title action under 28 U.S.C. § 2409a (1988). In this action, the Tribe sought (1) a declaration that the United States holds title to the bed of Devils Lake in trust for the benefit of the Tribe, (2) immediate possession of the lakebed and (3) fair compensation for the defendants' past use. On appeal, the Tribe contests the district court's conclusion that the Tribe indisputably compromised and settled its claim to the lakebed in a settlement agreement with the United States in 1977. In addition, the Tribe contends that the district court erred in dismissing its action against the remaining defendants notwithstanding the judgment in favor of the United States.

We reverse the order granting the United States' motion for summary judgment and reinstate the Tribe's complaint against all defendants. Our review of the evidence convinces us that the circumstances surrounding the 1977 settlement present sufficient ambiguity and uncertainty to raise a material factual dispute.

## I. BACKGROUND

The Devils Lake Sioux Tribe possesses beneficial title to the Devils Lake Reservation (also known as the Fort Totten Indian Reservation) in northeastern North Dakota. The Tribe is a constituent part of the Sisseton and Wahpeton Sioux Bands of the Great Sioux Nation (the Bands).

In 1867, the United States entered into a treaty with the Bands. This treaty, the Treaty of February 19, 1867, 15 Stat. 505, rewarded the Bands for their loyalty to the United States during the Sioux Uprising of 1862. In Article 2 of the Treaty, the United States recognized the Bands' claim to the lands

> bounded on the south and east by the treaty-line of 1851, and the Red River of the North to the mouth of the Goose River; on the north by the Goose River and a line running from the source thereof by the most westerly point of Devil's [sic] Lake to the Chief's Bluff at the head of James River, and on the west by the James River to the mouth of Mocasin River, and thence to Kampeska Lake.

This area included all of Devils Lake. Of future significance, the northernmost tip of this area, including the northern half of Devils Lake, overlapped with territory that the Chippewa claimed pursuant to a boundary agreement with the Bands called the Sweet Corn Agreement.[1] The relevance of this territorial overlap, which for convenience we refer to as the "Chippewa over-

---

1. Under the Sweet Corn Agreement, executed some time after 1825, the Bands agreed to the Chippewa's occupancy of all lands north of a line extending west from the Goose River and passing through the center of Devils Lake. For our purposes, it remains unnecessary to determine whether the United States possessed awareness of the Chippewa's competing claim when it entered into the Treaty of February 19, 1867 with the Sisseton and Wahpeton Bands.

lap region," will become apparent later in this opinion.

In Articles 3 and 4, the 1867 Treaty established two permanent reservations for the Bands within the lands described by Article 2. Article 3 of the 1867 Treaty established a reservation for the Bands at what is now Lake Traverse in South Dakota. The Lake Traverse Reservation is not otherwise relevant to the instant dispute.

Article 4 of the 1867 Treaty established a reservation for the Bands at Devils Lake. The Devils Lake Reservation (the Reservation) consisted of a tract

> [b]eginning at the most easterly point of Devil's [sic] Lake; thence along the waters of said Lake to the most westerly point of the same; thence on a direct line to the nearest point on the Cheyenne River; thence down said river to a point opposite the lower end of Aspen Island, and thence on a direct line to the place of beginning.

The parties to the instant action disagree whether the above description encompassed the bed of Devils Lake. To explain, in accordance with the above description, the Reservation (which may or may not have included the lakebed) was nestled into the northwestern portion of the Article 2 lands and completely encompassed by them. As mentioned above, these Article 2 lands also encompassed Devils Lake, the shore of which formed the northern boundary between the Reservation and the Article 2 lands. But which shore? Article 4 does not clearly delineate whether the parties to the 1867 Treaty intended the northern or southern shore of Devils Lake as the boundary line of the Reservation. If the boundary was the northern shore, as the Tribe contends, then the Reservation included the lakebed. Conversely, if, as the United States contends, the southern shore formed the boundary, then the lakebed lay outside of the Reservation.

The above dispute is important, because in 1872 the Bands entered into another agreement with the United States regarding the above lands. In this agreement, the Agreement of September 20, 1872, 17 Stat. 456, 18 Stat. 167, the Bands ceded title to all lands described in Article 2 of the Treaty of February 19, 1867, except for the reservations set out in Articles 3 and 4. Thus, depending on the interpretation of the 1867 Treaty, the Bands may or may not have ceded title to the bed of Devils Lake in the 1872 Agreement.

In 1946, Congress established the Indian Claims Commission to hear tribal claims against the United States. Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049 (current version at 25 U.S.C.S. § 70 to 70v–3 (Law.Co-op. 1983 & Supp.1990)). The Commission's jurisdiction extended to a broad variety of legal and equitable claims arising on or before August 13, 1946. *Id.* § 2, 60 Stat. at 1050. The Act empowered the Commission to grant monetary compensation but not declaratory or injunctive relief. *Navajo Tribe v. New Mexico*, 809 F.2d 1455, 1461 (10th Cir.1987).

In 1951, the Sisseton and Wahpeton Bands, in combination with other Sioux bands, filed a petition against the United States under the Act of August 13, 1946. This petition, as subsequently amended, asserted a two-part claim that retains relevance in the instant action. The first part, "the Reservation claim," alleged an unlawful taking or appropriation of lands originally ascribed to the Devils Lake Reservation by Article 4 of the 1867 Treaty. This claim included a request for compensation for 64,908 acres of land erroneously omitted from the Reservation in 1875 by a government surveyor, Charles Bates.

The second part, "the aboriginal title claim," asserted a right to fair compensation for (1) the treaty lands ceded to the United States under the Agreement of September 20, 1872, and (2) certain aboriginal lands known as the "Southern Triangle," which are not disputed in the instant action.

Neither the Reservation claim nor the aboriginal title claim made explicit reference to the bed of Devils Lake. Nevertheless, the Tribe's amended petition may have contained an implicit reference to the lakebed. To elaborate, the Tribe's amended petition used certain maps, popularly called "Royce maps," to refer to the areas in

contention.[2] Thus, the Tribe's amended petition identified the Devils Lake Reservation by area 497 on the Royce map (Royce 497) and the 1872 cession, in relevant part, as Royce 538. Admittedly, these Royce maps seem to describe the Reservation as lying south of the lakebed.[3]

In 1970 and 1971, the Bands presented the above claims to the Indian Claims Commission. During those proceedings, the parties continued to use the Royce maps to refer to the areas in question.

The Indian Claims Commission dealt with the Bands' claims in separate opinions. In 1973, the Commission ruled in favor of the Bands on the Reservation claim, including the claim for the 64,908 acres omitted by the erroneous Bates survey. *Lower Sioux Indian Community v. United States*, 30 Ind.Cl.Comm. 463 (1973). In this decision, the Commission described the Reservation as lying south of Devils Lake, *id.* at 483, 500–01, but did not address the title to the lakebed. The Bands prevailed on appeal, *Lower Sioux Indian Community v. United States*, 519 F.2d 1378, 207 Ct.Cl. 492 (1975), and ultimately received full compensation for the Reservation claim.

In 1975, the Commission ruled for the Bands on the aboriginal title claim. *Lower Sioux Indian Community v. United States*, 36 Ind.Cl.Comm. 472 (1975). In this decision, the Commission did not explicitly address the title issue, but appeared to implicitly include Devils Lake in the ceded territory. *Id.* at 473 & n. 2. In addition, the Commission's opinion suggested that the Tribe was entitled to compensation for the Chippewa overlap region, *id.* at 486–88,[4] which, as mentioned above, included part of Devils Lake. The Government appealed.

While the appeal was pending, the Department of the Interior issued an opinion on the Reservation boundary. This opinion, rendered in 1976, responded to an inquiry by the Attorney General of North Dakota about the acreage covered by the lakebed.[5] In fashioning this inquiry, the North Dakota Attorney General had apparently assumed that North Dakota acquired title to the bed of Devils Lake upon becoming a state in 1889. The Department of the Interior, however, in a memorandum drafted by an Associate Solicitor for Indian Affairs, concluded that "Devils Lake is not adjacent to the Fort Totten [Devils Lake] Sioux Indian Reservation but wholly within its boundaries and the United States holds title to the lakebed in trust for the Devils

---

**2.** These maps, drawn by Charles Royce in the 19th Century, purported to illustrate numerous Indian land cessions in the United States. *See* C. Royce, *Indian Land Cessions in the United States, reprinted in* Eighteenth Annual Report of the Bureau of American Ethnology, pt. II (1899). The Royce maps, while not a binding authority, were commonly used for convenience to identify the areas in question in proceedings before the Indian Claims Commission.

**3.** On the Royce maps, Royce 538 (the 1872 cession) completely encircles Royce 497 (the Reservation). In addition, the Royce maps depict Royce 497 (the Reservation) as bounded by the southern shore of Devils Lake. Although the maps show no similar boundary line between the northern shore of Devils Lake and Royce 538, the Tribe argues that some ambiguity still remains. Specifically, the Tribe points out that the maps, which employ color codes to depict the various tracts in question, show Royce 497 as purple, Royce 538 as yellow and the lakebed as blue. From this, the Tribe argues that the Royce maps depict the lakebed as lying outside of *both* Royce 497 and Royce 538. In this opinion, we do not deem it necessary to decide

whether such an inference could reasonably be drawn from the Royce maps.

**4.** This part of the opinion amounted to a seeming reversal of the Commission's position in *Turtle Mountain Band of Chippewa Indians v. United States*, 26 Ind.Cl.Comm. 336, 340–43 (1971), which recognized the Plains–Ojibwa's claim to the Chippewa overlap region.

**5.** The Attorney General's inquiry was prompted by an agreement, entered into in the 1960's, between North Dakota and the United States to engage in a water conservancy project, known as the Garrison Diversion Conservancy District. To pay for its share of the cooperative undertaking, North Dakota deeded its title to various lakelands to the United States in 1971. One of these lakelands was Devils Lake. The agreement, however, satisfied North Dakota's obligation only to the extent that the titles remained free of encumbrances from both the Tribe and adjoining landowners. *101 Ranch v. United States*, 905 F.2d 180, 184 & n. 7 (8th Cir.1990). In 1984, the Tribe attempted to intervene in *101 Ranch,* but the district court denied the request. The instant action to quiet title subsequently ensued.

Lake Sioux Tribe." [6] Appendices, vol. I, at 35.

The Department's opinion was communicated to the Devils Lake Sioux Tribe later that year. By early 1977, the Tribal Council for the Devils Lake Sioux Tribe met to discuss the Department's memorandum. On May 31, 1977, the Bands offered to settle their aboriginal title claim with the United States for $1.50 per acre. The settlement offer contained no references, either implicit or explicit, to the Royce maps. Instead, the offer delimited the settlement area, in essence, as the lands described by Article 2 of the 1867 Treaty plus the Southern Triangle, with two noteworthy exceptions. First, the settlement offer excluded "the acreage within the exterior bounds of the Lake Traverse Reservation and the Devil's [sic] Lake Reservation *as described in Articles 3 and 4 of the Treaty of February 19, 1867.*" Supplemental Appendix of Appellee United States at 26 (emphasis added) (citation omitted). Second, the settlement offer expressly excluded the Chippewa overlap region, notwithstanding the Indian Claims Commission's seeming recognition of the Bands' entitlement to compensation for this area, *see* discussion *supra* pp. 1052–1053 & note 4.

The United States accepted the offer and instructed the Bureau of Land Management (the Bureau) to calculate the applicable acreage. Upon completing the task, the Bureau sent out the following letter:

August 1, 1977

Assistant Attorney General
Land and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530
Attn: Mr. Bernard M. Sisson, Attorney-at-Law
Dear Mr. Sisson:

Re: Lower Sioux Indian Community in Minnesota, et al v. United States, Docket No. 363, before the Indian Claims Commission

Pursuant to Mr. Hickey's letter of June 21, 1977, we have computed the acreage in the overlap of the lands in the plaintiff's case with the lands of the Turtle Mountain Band of Chippewa Indians, Docket Nos. 113, et al.

Initially you requested only a computation of the overlap acreage, using a previously drawn preliminary map which was provided by you, as we had nothing in our files regarding the area in question.

After a preliminary study, which revealed virtually no overlap, and which cast doubt on the plotting of the above mentioned map, you requested by telephone that we research, replot, and recompute the acreage for the entire area involved in this case, in addition to computing the overlap acreage.

We have done so, computing the acreage on the WANG 2200 computer.

The amended acreages are as follows:

(1) Royce area 538

6,355,000 ac.

(2) Balance of the area described in Article 2 of the Treaty of February 19, 1867, outside of Royce area 538.

2,800,000 ac.

NOTE—The above areas *include* the acreage of the Fort Totten (Devils Lake) Indian Reservation, but *exclude* the acreage of the Sisseton (Lake Traverse) Indian Reservation.

You stated that you would deduct a previous acreage for the Fort Totten Reservation from the total.

(3) "Southern Triangle" (the area described in 2. of Mr. Hickey's letter of December 23, 1975).

565,000 ac.

Gross acreage—the sum of the above areas.

9,720,000 ac.

(4) Overlap with Turtle Mountain Band of Chippewa Indians, Docket Nos. 113, et al—land area only; disregard water area of Devils Lake per your instructions. Derived by plotting Devils Lake from the earliest official Government Land Office survey plats.

---

**6.** The United States asserted this position in subsequent litigation, Appendices, vol. I, at 65–66, but ultimately abandoned it, Appendices, vol. II, at 96.

138,000 ac.

Sincerely yours,

Acting Chief, Division of Cadastral Survey

Appendices, vol. I, at 105–06 (emphasis in original).

Based on the acreage figures provided by the Bureau, the total value of the land was calculated at $13,929,661. *See Lower Sioux Indian Community v. United States,* 41 Ind.Cl.Comm. 1, 3 (1977). Thus, given the $1.50 per acre figure, the 1977 settlement compensated the Bands for roughly 9,286,441 acres. It therefore appears that the parties deducted 295,559 acres for the Devils Lake Reservation, as calculated below:

$13,929,661 ÷ $1.50/acre = 9,286,440.6 acres

| | |
|---|---|
| 6,355,000 | Royce 538 (Article 2 of 1867 Treaty) |
| 2,800,000 | Article 2 area outside Royce 538 |
| + 565,000 | Southern Triangle |
| 9,720,000 | Gross Acreage |
| −9,286,441 | Settlement Acreage |
| 433,559 | Total Acreage Deductions |
| − 138,000 | Chippewa overlap region |
| 295,559 | Deduction for Devils Lake Reservation |

In 1981, the Department of the Interior withdrew support from its 1976 opinion that had recognized the Tribe's beneficial ownership of the lakebed. After attempting to intervene in a related action in 1984, *see supra* note 5, the Tribe filed this quiet title action against the United States, North Dakota, the Garrison Conservancy District and several private landowners.

The United States moved for summary judgment against the Tribe, listing several alternative grounds.[7] The district court granted the motion on a theory that the Tribe compromised and settled its claim against the United States in the 1977 settlement. *Devils Lake Sioux Tribe v. North Dakota,* 714 F.Supp. 1019, 1025–26 (D.N.D.

1989). Specifically, the district court concluded that the Tribe necessarily received compensation for the lakebed under the 1977 settlement, because:

(1) the Indian Claims Commission's opinions discussing the Bands' claims demonstrated that the Commission understood the Reservation to lie south of Devils Lake;

(2) the Royce maps, which the parties used to identify the relevant tracts during the Claims Commission proceedings, unambiguously put the lakebed in Royce 538, which lay outside the Reservation boundaries; and

(3) the Bureau of Land Management letter demonstrated that the Bureau, in calculating the acreage for Royce 538, explicitly excepted the land area of the Chippewa overlap region but did not similarly except the lakebed. *Id.* at 1022–24.

The district court further concluded that the Tribe could not maintain its action against the other parties in the absence of the United States and dismissed the Tribe's complaint against all defendants.

On appeal, the Tribe contends that the factors cited by the district court are sufficiently equivocal to preclude summary judgment on a compromise and settlement theory. We agree with the Tribe and reverse the order of summary judgment for the reasons discussed below.

## II. DISCUSSION

A court lacks authority to grant a summary judgment motion unless a party demonstrates that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The term "material fact" includes the inferences that reasonably may be drawn from undisputed facts. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 255, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Under our view of the record, a genuine factual dispute existed as to

---

**7.** In the district court proceedings, the United States asserted that the Tribe's claims were barred by (1) res judicata, (2) collateral estoppel, (3) the statute of limitations and (4) the terms of the 1977 settlement. The district court did not appear to address the United States'

contentions on the first three issues, nor did the parties brief them for this appeal. Consequently, we confine our discussion to the United States' fourth contention, *i.e.,* that the 1977 settlement bars the instant claim.

whether the Tribe settled its claim to the lakebed in 1977.

■■■ Under the Government's theory, the Tribe's claim to the lakebed turns on the interpretation of the 1977 settlement agreement. An agreement to settle a legal dispute is a contract. *Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C.Cir.1982). As such, its interpretation is governed by familiar principles of contract law. *See id.* Accordingly, the court's objective in interpreting a settlement agreement is to ascertain the actual intent of the parties at the time they executed it. *See Uinta Tunnel, Mining & Transp. Co. v. Ajax Gold Mining Co.*, 141 F. 563, 566 (8th Cir.1905); *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1083 (4th Cir.1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988). In construing an agreement, the court should endeavor to place itself in the position of the contracting parties and view the agreement in light of the facts and circumstances surrounding its execution. *Cook v. Foley*, 152 F. 41, 49 (8th Cir.1907) (quoting *Rockefeller v. Merritt*, 76 F. 909, 915 (8th Cir.1896)), *cert. denied*, 209 U.S. 543, 28 S.Ct. 570, 52 L.Ed. 919 (1908). *But cf. NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 682 (D.C.Cir.1985) (absent ambiguity, court will confine inquiry to four corners of agreement).

■■■ The agreement in the instant case permits the inference that the parties excluded the lakebed from the 1977 settlement. Most significantly, the figures listed in the Bureau of Land Management letter suggest that the parties subtracted 295,559 acres to account for the Reservation. This figure is reasonably consistent with the Government's own acreage estimates for the Reservation inclusive of the lakebed. Indeed, according to the affidavit of James Simpson, a Government surveyor, the land area of the Reservation in 1867 encompassed some 233,875 acres and the lakebed some 72,300 acres. Thus, by the Government's own estimate, the combined area of Reservation land plus original lakebed consisted of 306,125 acres.

In addition, even the relatively small discrepancy between the actual acreage subtracted (295,559) and the Government's estimate of the original combined acreages (306,125) can be explained. Specifically, by the Government's admission, the parties to the 1977 settlement did not conduct a historical survey to determine the original lakebed acreage, and the Simpson affidavit indicated that the lakebed has shrunk considerably since 1867.

The above figures are further buttressed by an affidavit submitted by Marvin Sonosky, the tribal attorney who negotiated the 1977 settlement. According to Sonosky, "At no time was any question raised as to the acreage underlying the waters of Devils Lake." Appendices, vol. I, at 103. The import of the above statement is that the Tribe may have gone uncompensated for the lakebed by the 1977 settlement.

Accordingly, we think the district court read too much into the Bureau of Land Management letter. This letter does not say that the lakebed acreage was included in the 9.2 million acres that the Bureau attributed to Royce 538. Further, the letter itself casts doubt on the parties' intent to rely on the Royce boundaries. According to the Bureau letter, the Government initially provided the Bureau with a "previously drawn preliminary map," and not a Royce map, of the areas in question.

The Government nevertheless contends that certain calculations in the district court's opinion prove that the parties' deduction for the Reservation could not have included the lakebed. The Government's reliance on the district court's figures, however, is misplaced. To explain, the district court opinion includes a chart, which at first glance appears to indicate that the parties deducted only 230,651 acres to account for the Reservation. 714 F.Supp. at 1024. Upon further examination, though, it becomes clear that the district court's figures do not represent the size of the *original* Reservation in 1867. Instead, the court's figures represent the size of the Reservation in 1875, after the Bates survey erroneously omitted 64,908 acres from its boundaries. *Id.* at 1024 & n. 5. This is confirmed by historical data that the Government itself supplied in the proceed-

ing before the district court. Memorandum in Support of Motion for Summary Judgment at 36–38 (Document No. 117). This data indicates that, without the lakebed, the Reservation encompassed some 230,400 acres before the Bates survey. *Id.* at 37.

Furthermore, the circumstances surrounding the 1977 settlement also permit the inference that the parties excluded the lakebed from their agreement. To begin with, we are struck by the fact that the parties settled this case within months after the Department of the Interior issued a memorandum opining that the United States held the lakebed in trust for the Tribe. In addition, we deem it noteworthy that the settlement agreement defines the Reservation boundaries solely by reference to the Treaty of February 19, 1867, and is devoid of any reference to the Royce maps. In view of the parties' prior practice of incorporating the Royce maps in their territorial definitions, an inference remains that the parties intended to abandon the Royce maps and rely solely on the 1867 Treaty to delimit the Reservation boundaries.

We further deem it significant that the 1977 settlement expressly excluded the Chippewa overlap region. Notably, the Indian Claims Commission suggested that the Bands were entitled to compensation for this area, which included half of Devils Lake. Thus, one implication of the provision excluding the overlap region is that the parties intended to exclude the lakebed from the settlement.

In a word, the district court placed undue emphasis on the parties' manner of presenting their case before the Indian Claims Commission in 1970–71 and the Commission's resultant understanding of the boundaries now in question. The crucial question in this case is what the parties intended in 1977 when they opted to settle the aboriginal title claim. Thus, for the purpose of interpreting the 1977 settlement, the parties' representations before the Indian Claims Commission possess relevance only insofar as these representations remain a valid indicia of the parties' intent in 1977.

The Government nevertheless asserts that the following provision in the stipulation for settlement expressly precludes the Tribe's present claim:

5. Subject to the provisions of Paragraph No. 1 of this stipulation, the entry of final judgment as described in Paragraph No. 3 above, shall finally dispose of all rights, claims, or demands which the plaintiffs have asserted, or could have asserted in Docket No. 363 [*Lower Sioux Indian Community v. United States*]....

Supplemental Appendix of Appellee United States at 36. We remain unconvinced. The facts of the instant case suggest that the parties may have deliberately excluded the lakebed from the 1977 settlement because they considered it part of the Reservation. Admitting such a possibility, it would be counterintuitive to conclude as a matter of law that the parties intended the 1977 settlement to prevent the Tribe from asserting a subsequent claim to the lakebed.

Beyond this, it remains subject to question whether the Tribe could have presented its claim to the lakebed before the Indian Claims Commission. As mentioned above, the Indian Claims Commission retained jurisdiction only over claims arising prior to 1946. By contrast, the Tribe asserts that its claim arose in 1981 when the United States allegedly refused to recognize the Tribe as the beneficial owner of the lakebed. Moreover, the Commission could only award monetary relief and possessed no authority over non-federal defendants.

We therefore remand this case to the district court for proceedings consistent with this opinion. The record does not support a summary judgment on a theory that the 1977 settlement disposes of the Tribe's alleged rights. For the reasons mentioned above, this issue requires further development on the merits.

## III. CONCLUSION

Accordingly, we reverse the district court's order granting summary judgment for the United States on the basis of com-

promise and settlement. In addition, we reverse the order dismissing the Tribe's complaint against the remaining defendants because this dismissal was premised on the dismissal of the United States. We express no opinion on the merits of the United States' other contentions in support of summary judgment. Likewise, at this juncture, we express no opinion on whether the Tribe could maintain its action against the remaining defendants in the absence of the United States.

