898 P.2d 1256

STATE of New Mexico ex rel. Eluid
L. MARTINEZ, State Engineer,
Plaintiff–Appellee,

v.

KERR–McGEE CORPORATION,
et al., Defendants–Appellees,

Pueblo of Acoma and The United States
of America, Pueblo of Laguna,
Defendants–Appellants.

No. 14778.

Court of Appeals of New Mexico.

April 10, 1995.

Certiorari Denied June 29, 1995.

Peter C. Chestnut, Ann Berkley Rodgers, Chestnut Law Offices, Albuquerque, for Pueblo of Acoma/defendants-appellants.

Lester K. Taylor, Teresa Isabel Leger, Nordhaus, Haltom, Taylor, Taradash & Frye, Santa Fe, for Pueblo of Laguna/defendants-appellants.

John J. Kelly, U.S. Atty., Herbert A. Becker, Asst. U.S. Atty., U.S. Dept. of Justice, Albuquerque, and Ellen J. Durkee, Appellate Section Environmental and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for U.S. defendant-appellant.

Martha C. Franks, Sp. Asst. Atty. Gen., State Engineer Office, Santa Fe, for State of N.M. ex rel. Eluid L. Martinez, State Engineer.

Sunny J. Nixon, William P. Templeman, Carpenter, Comeau, Maldegen, Brennan, Nixon & Templeman, Santa Fe, for Plains Elec. Generation and Transmission Co-op., Inc./defendants-appellees.

Galen M. Buller, Grace Philips, Montgomery & Andrews, P.A., Santa Fe, for El Paso Natural Gas Co./defendants-appellees.

Benjamin Phillips, Paul L. Bloom, White, Koch, Kelly & McCarthy, P.A., Santa Fe, for Bluewater–Toltec Irr. Dist. and individuals and entities listed in Motion to substitute Counsel filed Oct. 30, 1990/defendants-appellees.

## OPINION

BOSSON, Judge.

The Pueblos of Laguna and Acoma ("the Pueblos") are parties to an ongoing adjudica-

tion of water rights initiated by the New Mexico State Engineer against all claimants to the Rio San Jose stream system in Cibola County, New Mexico. On the State Engineer's motion, the district court granted partial summary judgment against the Pueblos based on theories of issue and claim preclusion. These theories, in turn, derive from prior settlements between the Pueblos and the United States government involving land and water litigation initiated over forty years ago before the federal Indian Claims Commission ("ICC"). The essence of the State Engineer's argument is that the Pueblos are bound by the ICC proceedings. As a general proposition, we agree. Our challenge is as-certaining what did, in fact, occur long ago and what was actually and necessarily re-solved. We hold that the ICC proceedings did not extinguish the water rights the Pueb-los now claim and therefore reverse the sum-mary judgment to that extent. However, we affirm the district court's ruling that, there are no *Winters* doctrine water rights" ap-purtenant to the lands given the Pueblos by the Spanish or Mexican governments ("grant lands"). Accordingly, we affirm in part, re-verse in part, and remand for further pro-ceedings.

*FACTS*

Congress created the ICC in 1946 to adju-dicate Indian claims against the United States, including those based on the histori-cal failure of the United States to protect Indian land and water from non-Indian en-croachment. *See* 25 U.S.C.S. § 70 (1983). Indian claimants were permitted to allege that the government had not engaged in " 'fair and honorable dealings' " with the tribes, thereby directly or indirectly permit-ting the loss of Indian land. *Id.* A major portion of the litigation before the ICC con-sisted of tribal claims for the loss of aborigi-nal territory. *See generally United States v. Dann,* 470· U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985).

The ICC's jurisdiction was limited to mon-etary compensation for loss; it could not vindicate or establish Indian title by declara-tory or injunctive relief. The United States

and the particular Indian tribe were the only parties allowed to participate in ICC pro-ceedings. There was no intervention allowed by private third parties claiming their own interest in the land. Only losses occurring prior to the date of the statute were subject to ICC remedy. The statute creating the ICC specifically provided that payment of a tribal claim would constitute a full discharge of the United States with respect to any liability arising out of that claim. *See* 25 U.S.C.S. § 70s.

In 1951, the Laguna and Acoma Pueblos each filed a claim with the ICC against the United States. They sought monetary com-pensation for permanent loss of aboriginal lands and appurtenant water rights, which historically the Pueblos had utilized, but which had become permanently lost over time ("lost lands"). As a secondary claim, the Pueblos also asserted a compensable loss of irrigation waters appurtenant to lands lo-cated *within* Pueblo boundaries ("retained lands"). This loss allegedly occurred in 1927, when non-Indians enlarged the Bluewater Dam on the upper Rio San Jose with at least the tacit approval of the United States gov-ernment.

In 1967, the ICC issued interlocutory deci-sions in both Pueblo cases. The ICC deter-mined that the Pueblos had suffered the extinguishment of their title to aboriginal lands and appurtenant water rights (lost lands) due to the action or inaction of the United States and that the Pueblos should be compensated for their loss. The ICC also found that the Pueblos had failed to prove that the enlargement of Bluewater Dam had diminished irrigation water on Pueblo re-tained lands. Following the ICC decisions on liability, the Pueblos entered into lengthy settlement negotiations with the government which were consummated in 1970. The Unit-ed States paid the amounts agreed upon.

In 1982, the State Engineer commenced the present water rights adjudication. The Pueblos, the United States, and numerous other defendants, both private and public, were brought into the litigation. Pursuant to

a motion for partial summary judgment, the State Engineer and many non-Indian defendants sought to establish that the Pueblos had already been compensated for the loss of the very water rights they were now claiming in this adjudication. The State Engineer argued that the Pueblos were barred from relitigating those claims in this proceeding. A special master was appointed to take evidence and make recommendations. The special master's recommendation favored the State Engineer on the issue of preclusion.

Concurring in the special master's recommendation, the district court applied preclusion principles of collateral estoppel and res judicata and determined that the Pueblos could not relitigate ownership of water rights on retained lands, because those claims had already been decided by the ICC and paid for in the settlements. The district court also adopted the special master's recommendation regarding "*Winters* doctrine water rights" and ruled that the Pueblos had no such rights appurtenant to their "grant lands." The Pueblos and the United States, acting as trustee for the Pueblos, then filed an application for interlocutory appeal to this Court, which we granted. We note that a number of non-Indian defendants in the water rights adjudication have joined forces and are aligned with the State Engineer in the proceedings below and in this appeal. For ease of reference, we refer to the respective parties in this case as the State, the Pueblos, and the United States.

*DISCUSSION*

The district court determined that the Pueblos had already adjudicated and settled for compensation, all claims to water rights appurtenant to retained lands which were allegedly lost by enlargement of the Bluewater Dam. Accordingly, the district court concluded that the Pueblos cannot reassert claims to those same rights in this proceeding. For the following reasons, we disagree.

The State argues three theories under which the ICC proceedings might have preclusive effect—(1) res judicata, or claim preclusion; (2) collateral estoppel, or issue preclusion; and (3) a concept of general statutory preclusion derived from case law and based on the theory that the Indian Claims Commission Act ("ICCA"), 25 U.S.C.S. §§ 70–70w, was designed to resolve Indian land questions once and for all. Courts have applied all three theories in cases discussing the effect of ICC proceedings on subsequent litigation. *See, e.g., Western Shoshone Nat'l Council v. Molini,* 951 F.2d 200, 202 (9th Cir.1991) (holding that an ICC award conclusively establishes that title has been extinguished), *cert. denied,* 506 U.S. 822, 113 S.Ct. 74, 121 L.Ed.2d 39 (1992); *United States v. Pend Oreille Pub. Util. Dist. No. 1,* 926 F.2d 1502, 1508 (9th Cir.) (noting that the chief purpose of the ICCA is to dispose of the Indian claims problem with finality), *cert. denied,* 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991); *United States v. Dann,* 873 F.2d 1189, 1194 (9th Cir.) (holding that payment for taking of aboriginal title establishes that the title has been extinguished), *cert. denied,* 493 U.S. 890, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989); *Oglala Sioux Tribe v. Homestake Mining Co.,* 722 F.2d 1407, 1413 (8th Cir.1983) (collateral estoppel); *United States v. Dann,* 572 F.2d 222, 226 (9th Cir.1978) (collateral estoppel); *State Dep't of Ecology v. Yakima Reservation Irrigation Dist.,* 121 Wash.2d 257, 850 P.2d 1306, 1324–25 (1993) (en banc) (res judicata). We analyze separately each of these theories.

The parties apparently assume that federal law, rather than state law, governs the preclusive effect of the ICC proceedings. *See generally Edwards v. First Fed. Sav. & Loan Ass'n,* 102 N.M. 396, 402–05, 696 P.2d 484, 490–93 (Ct.App.1985) (discussing applicability of federal collateral estoppel). For purposes of this case, we make the same assumption. *Id.*

*Claim Preclusion*

■ Claim preclusion bars litigation of claims that were or could have been advanced in an earlier proceeding. *See Miller v. United States Postal Serv.,* 825 F.2d 62, 64 (5th Cir.1987); *Cayuga Indian Nation of N.Y. v. Cuomo,* 667 F.Supp. 938, 947

(N.D.N.Y.1987). Claims are not precluded, however, where a plaintiff could not seek a certain relief or rely on a certain theory in the first action due to limitations on the subject matter jurisdiction of the first tribunal. *See* Restatement (Second) of Judgments § 26(1)(c) (1980).

■ Congress created the ICC as a tribunal of limited jurisdiction, restricted by statute to monetary claims against the United States for the loss of lands and other property. *See* 25 U.S.C.S. § 70a. In their claims before the ICC, the Pueblos could not have quieted title to lands or asserted ownership of water rights against the government. Similarly, the Pueblos could not have brought any claims against the State of New Mexico nor against the very private parties who oppose them in this litigation. The Pueblos brought the only claim possible, seeking monetary compensation from the United States for loss of title. Therefore, the Pueblos' current effort to establish water rights against the competing claims of non-Indians was not, and could not have been, brought before the ICC. The Pueblos should not be barred from asserting this claim now, for the first time, when it could not have been brought previously before the ICC. *See Devils Lake Sioux Tribe v. North Dakota,* 917 F.2d 1049, 1056 (8th Cir.1990) (refusing to apply claim preclusion to Indian claim of title because ICC lacked jurisdiction over that claim); *Cayuga Indian Nation of N.Y.,* 667 F.Supp. at 947 (rejecting res judicata, in part, because the tribe could not have brought present action in ICC proceedings). We note that *State Department of Ecology,* 850 P.2d at 1324–25 (applying Washington state law), is contrary. However, because the opinion failed to analyze the effect of the ICC's limited jurisdiction, as well as the dissimilarity in the causes of action and parties, we do not find that opinion persuasive and decline to follow it.

*Issue Preclusion*

■ Issue preclusion bars litigation of an issue (1) that was "actually litigated" (that is, contested in a prior action), and "actually and necessarily determined" in a final judgment; and (2) when preclusion of subsequent litigation would be fair or, as more commonly stated, when the parties had a full and fair opportunity to litigate the issue in the first proceeding. *See Connors v. Tanoma Mining Co.,* 953 F.2d 682, 684 (D.C.Cir.1992); *Oglala Sioux Tribe,* 722 F.2d at 1413; Restatement (Second) of Judgements § 27. Whether an issue was actually and necessarily determined in the prior action is a question of law to be addressed de novo by the appellate court. *See Connors,* 953 F.2d at 684. The party seeking to preclude litigation of an issue has the burden of showing with clarity and certainty that the issue was actually and necessarily determined; if the basis of the prior decision is unclear, subsequent litigation may proceed. *See id.; Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1321 (9th Cir.1992); *see also Gulf Tampa Drydock Co. v. Germanischer Lloyd,* 634 F.2d 874, 877–78 (5th Cir.1981).

We begin by observing that settlements and consent judgments are not normally considered fertile ground for issue preclusion. By its nature, a consent judgment usually falls short of a full-blown, contested adjudication of all issues, so that the end result, being achieved by negotiation, may well include matters that were not actually and necessarily decided by the court. Therefore, in its simplest terms, we are taught by experience that a non-adjudicated judgment is a less reliable source for the sense of *fairness* that underscores the preclusion doctrine. Just as it would be unfair to permit a party a second chance to improve on his performance in regard to a given issue clearly decided against him, it would be equally unfair to presume prior determination of an issue from the mere fact of settlement when the contrary may more likely be true. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also Rodriguez v. Flores,* 154 Misc.2d 160, 584 N.Y.S.2d 269, 270 (1992) ("There are few immutable rules to the doctrine of collateral estoppel because it is based on general notions of

fairness."); *State v. Santomauro*, 261 N.J.Super. 339, 618 A.2d 917, 919 (1993) ("Moreover, collateral estoppel is an equitable doctrine and need not be applied ... if it would not be fair to do so."); *see generally* Restatement (Second) of Judgments § 27; 1B James W. Moore et al., *Moore's Federal Practice* ¶¶ 0.441–0.445 (1988).

Thus, learned commentary usually discourages reliance on consent judgments and settlements for purposes of estoppel. Professor Moore states succinctly, "collateral estoppel in its usual connotation should not result from a consent judgment, because the requisite litigation and judicial determination of issues are not normally present." 1B James W. Moore et al., *Moore's Federal Practice* ¶ 0.444[3], at 814; *see* Restatement (Second) of Judgments § 27 cmt. e ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."); *see generally* 1B James W. Moore et al., *Moore's Federal Practice* ¶ 0.444[3], at III. –613 to –614 (1994) (recognizing "[t]he present federal rule ... as indulging a presumption" that "in an action on a different claim or cause of action the [consent] judgment has no preclusive effect[ ], i.e., that collateral estoppel or issue preclusion does not apply."). The Restatement (Second) of Judgments further observes that where it is difficult to determine whether an issue is actually litigated, "the policy considerations ... weigh strongly in favor of nonpreclusion." However, "[t]he judgment may be conclusive ... if the parties have entered an agreement manifesting such an intention." *Id.; see generally Johnson v. Aztec Well Serv. Co.*, 117 N.M. 697, 875 P.2d 1128 (Ct. App.1994) (discussing application of claim preclusion to a claim for workers' compensation following a lump sum settlement). In this case, one of the elements of issue preclusion is missing.

In certain respects, proceedings before the ICC were sharply different from the usual civil case which ends in a settlement. ICC proceedings were often, if not always, bifurcated into separate phases—a liability phase and a valuation phase. The ICC would first hold hearings and take evidence to decide whether the tribe had formerly owned certain lands or property which had been lost due to some fault of the United States. Following a determination of liability, the separate valuation phase often, but not always, concluded in settlement. This bifurcated procedure was specifically contemplated by statute, and a direct appeal could be taken from the liability phase even though the case was not yet complete. *See* 25 U.S.C.S. § 70s; *see, e.g., Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d at 1507–08 (involving seven years of litigation on the liability issue followed by five years of valuation negotiations); *Temoak Band of W. Shoshone Indians v. United States*, 593 F.2d 994, 996, 219 Ct.Cl. 346 (where ICC had already made findings concerning amount of land taken, trial then held on valuation of those lands), *cert. denied sub nom.*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979); *Dann*, 572 F.2d at 225; *United States v. Gemmill*, 535 F.2d 1145, 1149 (9th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976).

■ Where, as here, split trials are permitted—segregating liability from damages—we cannot necessarily be satisfied with the general presumption against grounding issue preclusion on a mere settlement. To find out, we must focus on whether, within that liability phase, a particular issue may have been actually and necessarily determined by the forces of litigation. *See* Restatement (Second) of Judgments § 13, illus. 3; *cf. Turshen v. Chapman*, 823 F.2d 836, 839 (4th Cir.1987).

In the liability phase involving these Pueblos, the ICC made extensive findings, some fifty pages in the Laguna case, 17 Ind.Cl. Comm. 615, and a comparable effort in the Acoma proceeding, 18 Ind.Cl.Comm. 154 (1967). Clearly, the liability phase "actually and necessarily determined" some issues, such as the amount and location of lands forever "lost" to the Pueblos. 17 Ind.Cl. Comm. at 664–65, 698; *see Connors*, 953 F.2d at 684–85; *Oglala Sioux Tribe*, 722 F.2d at 1413–14 (applying collateral estoppel to ICC

decision on liability). Presumably, the Pueblos would be estopped from ever asserting a contrary position: that this land had not been lost and paid for by the government.

■ However, contrary to the State's argument, we are not persuaded that the liability phase ever determined the precise issue before us: liability for loss of water on retained lands. To begin with, the ICC findings that were so extensive and detailed in regards to the lost lands, paid relatively little attention to the claim of lost water on retained lands. 17 Ind.Cl.Comm. at 664, 698. Even in its abbreviated reference to the issue, the ICC initially found that there had been *no* proof of any loss of water resulting from the construction and enlargement of Bluewater Dam. *See id.* In other words, far from agreeing to compensate the Pueblos for a loss of water on retained lands (the very water now claimed by the Pueblos), the ICC, at least in its initial findings, determined that the Pueblos should *not* be compensated because they had proven *no* loss.

After these initial decisions, the Pueblos moved to strike the findings concerning the non-loss of water on retained lands. The parties dispute the reason for the motions. The ICC appears to have interpreted the motions as requests that the Pueblos not be impeded from presenting expert evidence in the damages phase concerning the irrigability (and increased value) of some of the lost lands. *See* 19 Ind.Cl.Comm. 152, 154 (1968) (separate orders) (ICC order amending findings " 'so as to allow petitioners to present expert witnesses to testify regarding the value of the lands [*sic* ] irrigated area as a part of the value as a whole of the lands taken.' "). The ICC did not intend its rejection of claims for damages to retained lands from the Bluewater Dam to affect the Pueblos' ability to prove that some of their lost lands were more valuable due to potential irrigation, at least without the Dam. *See* 18 Ind.Cl.Comm. at 366 ("It was never intended by the Commission that . . . the finding and opinion would have the effect of foreclosing petitioner from presenting expert witnesses to testify re-

garding the value of any lands taken, irrigated or otherwise."). Therefore, the ICC agreed to remove from its findings any reference to the absence of proof of loss of water. *Id.* Significantly, the ICC never added any language to the decisions indicating that water *had* been taken or that the Pueblos could recover compensation from the United States. As a result, the ICC findings, as modified, do not address the loss of water on retained lands and simply establish the amount of land that the Pueblos had lost outside its boundaries. *See Switzer Bros., Inc. v. Locklin,* 297 F.2d 39, 45 (7th Cir.1961) (the absence of a finding is equivalent to a finding against the party who had the burden of establishing a certain fact), *cert. denied,* 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962); *Woods v. Turner,* 172 F.2d 313, 315 (10th Cir.1949) (same). Therefore, even with our focused inquiry into the liability phase of the ICC proceedings, we cannot fairly conclude that this issue was actually and necessarily determined by the ICC, and particularly we cannot conclude that the issue was decided in a manner that would estop the Pueblos from maintaining their present position.

Notwithstanding the ICC findings, the State also argues that the settlements themselves should have preclusive effect. The State claims that the settlements, without reference to the intervening liability decisions of the ICC, imply that the Pueblos did receive compensation for water rights lost as a result of Bluewater Dam, including water rights on lands retained by the Pueblos. The logic of the State's argument is: (1) the Pueblos filed pleadings before the ICC which included claims for all water rights lost due to Bluewater Dam; (2) upon settlement, the Pueblos settled all claims filed against the United States, executed documents to that effect, and received compensation for all those claims; and (3) it necessarily follows that the compensation included all claims to lost water rights on retained land.

Aside from what we have said earlier, cautioning against the use of settlements and consent judgments as a basis for issue pre-

clusion, there are at least two additional problems with this argument. First, it presupposes that the settlements contradict the initial findings of the ICC to the effect that the United States was *not* liable for loss of water on the retained lands. Given a choice between according preclusive effect to a settlement which is unclear on what may actually have been decided and preclusive effect to findings which actually and necessarily determine an issue (*i.e.*, the Pueblos were *not* entitled to compensation for loss of water on retained lands), we choose the latter. *See* Restatement (Second) of Judgments § 27; *see also Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d at 1508 (in ascertaining issues actually and necessarily determined by the ICC, courts look beyond pleadings to actual findings).

The second problem is that given the ICC findings concerning liability and the subsequent settlements, it is impossible to discern the actual basis of the compensation paid to each Pueblo, and therefore exactly what was being "decided." The settlement documents are unspecific and vague in their descriptions; they are detailed only in what was most important to the parties: acreage of lost lands and the price paid. There is no indication of the amount paid, if any, for claims of lost water on retained lands. Because of the ICC findings on liability, it would be speculative at best to assert that the Pueblos were actually compensated for loss of water when the settlement language is ambiguous. *See Silva v. State*, 106 N.M. 472, 476, 745 P.2d 380, 384 (1987) (limiting the use of collateral estoppel "where the record is insufficient to determine what issues were actually and necessarily determined by prior litigation"). While the government included language in the settlements dismissing all claims, including claims for lost water, this fact alone reveals nothing about whether the Pueblos were actually compensated for any lost water appurtenant to retained lands, and it is equally uninformative about whether this issue was actually and necessarily determined for or against the Pueblos. To the contrary, once the ICC initially decided that the Pueblos were *not* entitled to compensation for lost water, it is more likely that the government paid to settle those claims for which the United States *was* liable, rather than paying on claims for which the government was *not* liable. *See Devils Lake Sioux Tribe*, 917 F.2d at 1055–56 (interpreting ambiguous ICC settlement as not precluding claim to lakebed when United States had acknowledged that lakebed had not been taken and that no compensation had been paid for it).

Therefore, we hold that the State failed to meet its burden of showing with clarity and certainty that the lost water issue was "actually and necessarily" decided in the Pueblos' favor or that the settlements included any compensation for such lost water. *See Clark*, 966 F.2d at 1321 (burden on party asserting preclusion to show with clarity and certainty what was actually decided). The Pueblos are not precluded, either as a result of the settlements or any of the ICC findings or determinations, from asserting their ownership of water rights appurtenant to retained lands. *See Connors*, 953 F.2d at 684; *Gulf Tampa Drydock Co.*, 634 F.2d at 877–78.

*Statutory Preclusion*

Most cases that have given preclusive effect to prior ICC proceedings have relied more on a theory of statutory preclusion than on the traditional preclusion doctrines. These cases recognize that by creating the ICC, Congress intended that an ICC determination of liability would conclusively establish that title had been extinguished and could not be reasserted by the tribe. *See, e.g., Western Shoshone Nat'l Council*, 951 F.2d at 202; *Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d at 1508. The case law implies that Congress created a statutory method of preclusion for this particular subject matter. Although nothing in the actual language of the statute indicates such an intent, we address the theory as it applies to this case, since it has been relied upon by a number of courts.

The same rules applicable to issue preclusion analysis should apply to the statu-

tory preclusion theory. Federal cases have applied each theory, and none has indicated any significant difference between them. The theories share the same objective: to determine exactly what was litigated and decided in the prior proceeding, so that courts can determine the basis of the compensation received by those tribes.

Under statutory preclusion, the burden should still be on the party asserting preclusion to establish that compensation was actually paid for the subject property. Preclusion should not be applied if it is unclear what was decided, or whether the tribe was in fact compensated for the loss of the same property which the tribe now claims as owner. *Compare Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d at 1508 (determining that the ICC did decide riverbed was taken, and holding that title to the riverbed had been extinguished) *with Devils Lake Sioux Tribe*, 917 F.2d at 1056 (recognizing a question of fact as to whether the disputed property was covered by an earlier settlement and making preclusion inappropriate). As discussed above, it is impossible to determine whether the settlement at issue in this case included any compensation for such lost water. Because the State failed to show with certainty that the Pueblos were compensated for lost water, the application of statutory preclusion is not appropriate. *Cf. Clark*, 966 F.2d at 1321.

### Winters Doctrine Water Rights

■ The district court granted summary judgment on another issue involving the question of federally reserved water rights. *See Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908) (recognizing that when federal government reserved land for an Indian reservation, it implicitly reserved sufficient water rights for reservation needs). Although the Pueblos have some questions concerning the scope of the court's ruling, it is clear from the motions for summary judgment that the ruling applies only to the grant lands. The ruling does not apply to lands conveyed to the Pueblos by Presidential Executive Order.

Both the Pueblos and the United States gave little attention to this issue in their briefs. They argue that the United States, by enacting a statute concerning Pueblo lands and by taking other actions, recognized the Pueblos' prior water rights. The Pueblos maintain that such recognition is equivalent to the reservation of water rights that occurs under *Winters*, when the federal government reserves land for an Indian reservation or for other purposes.

Neither the Pueblos nor the United States mention the only published cases that, to our knowledge, have discussed this issue. *See State v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976) (*Aamodt I*), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *State ex rel. Reynolds v. Aamodt*, 618 F.Supp. 993 (D.N.M.1985) (*Aamodt II*). The majority opinion in *Aamodt I* could be interpreted as approving the concept of some *Winters* water rights in the Pueblos. *See Aamodt I*, 537 F.2d at 1113, 1119 (Barrett, J., concurring in part and dissenting in part) (interpreting majority opinion as holding that Pueblo water rights are *Winters* doctrine rights); *Felix S. Cohen's Handbook of Federal Indian Law* 580 n. 10 (1982) (same). When called upon to implement *Aamodt I*, however, the federal district court rejected this theory. *See Aamodt II*, 618 F.Supp. at 996, 1010 (reiterating that the *Winters* doctrine does not apply to Pueblo lands other than Executive Order lands). The federal district court reasoned that because the Pueblos already owned their lands pursuant to grants from the Spanish and Mexican governments, there was nothing for the United States to grant or reserve when the Pueblos came under United States sovereignty. *Id.* The United States was merely recognizing that which had already been granted.

The *Aamodt II* approach has a certain logical appeal. Recognition of a right is different from reservation of that right. Recognition merely acknowledges the existence of an already extant right, while reservation creates the right in the first instance. Concerning the Pueblos grant lands, the United States did not undertake any grant or reser-

vation of land that might give rise to reserved water rights as well. Instead, the Pueblos' right to use both land and water appears to arise out of both aboriginal use and affirmative actions taken by the Spanish and Mexican governments toward the Pueblos. *See Aamodt II,* 618 F.Supp. at 1010. In *Aamodt II,* the federal court applied Spanish and Mexican water law and the idea of aboriginal use, rather than the *Winters* doctrine, to determine the nature of Pueblo water rights on grant lands. Neither the Pueblos nor the United States assert a persuasive reason to disagree with the *Aamodt II* analysis. Therefore, we affirm that portion of the district court judgment determining that the *Winters* doctrine does not apply to the Pueblo grant lands. We note that neither our holding nor this discussion should be interpreted as a comment on the nature, scope, or existence of aboriginal water rights or their rights under Spanish or Mexican water law. Our holding is limited to the *Winters* issue.

*CONCLUSION*

We hold that the district court erred in granting summary judgment for the State because neither the settlements nor the ICC findings and determinations preclude the present claims of the Pueblos to water rights appurtenant to retained lands. We also hold, however, that the district court correctly decided that the *Winters* doctrine does not apply to Pueblo grant lands, and affirm that portion of the summary judgment. We remand for further proceedings in the water rights adjudication consistent with this opinion.

IT IS SO ORDERED.

APODACA, C.J., and MINZNER, Justice (sitting by designation), concur.